Carolee KOSTER, Plaintiff,

v.

CHASE MANHATTAN BANK and Allan Ross, Defendants.

No. 81 Civ. 5018 (GLG).

United States District Court, S. D. New York.

Feb. 1, 1982.

Kresky, Sinawski & Hollenberg, New York City, for plaintiff; Gary Sinawski, New York City, of counsel.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for defendant Chase Manhattan Bank; Morton M. Maneker, Jeffrey D. Fields, New York City, of counsel.

Milgrim, Thomajan, Jacobs & Lee, New York City, for defendant Allan Ross; Robert F. Fink, New York City, of counsel.

Squadron, Ellenoff, Plesent & Lehrer, New York City, for News Group Publications, Inc., as amicus curiae; Slade R. Metcalf, New York City, of counsel.

Patterson, Belknap, Webb & Tyler, New York City, for New York News, Inc., and Dow Jones & Co., Inc., as amicus curiae; Michael B. Mukasey, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

Carolee Koster commenced this action against the Chase Manhattan Bank (the Bank) and Allan Ross, a former vice-president of the Bank, alleging, *inter alia*, violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*[1] The gist of her claim is that, while she and Ross were employed by the Bank,[2] Ross forced her to engage in a sexual relationship with him and abused her and interfered with her career when she terminated the relationship. She seeks injunctive relief, a declaratory judgment, and damages.

To say the least, this lawsuit has attracted more than the usual amount of media attention. During the month of August, for example, various representatives of the media interviewed Koster, as well as one of her attorneys, and reported her claims of sexual harassment in newspaper articles,[3]

---

1. The plaintiff also asserts claims under the Equal Pay Act, 29 U.S.C. § 206(d) (1976), New York State law, and New York City law.

2. Both were employed as vice-presidents, but Ross was her superior.

3. The Court has been given copies of articles that appeared in the New York Daily News on August 13 and 14, 1981 and in the New York Post on those same days. In addition, Ross claims that articles appeared in the Wall Street

on television,[4] and on radio.[5] According to the defendants, this widespread and, at times, somewhat sensationalized coverage[6] has resulted in injury to the reputations of Ross, the Bank, and its employees. To avoid further embarrassment, therefore, the defendants have moved for a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure and this Court's general equitable powers—a course of action vigorously opposed by the plaintiff and several representatives of the news media who have submitted briefs as *amicus curiae*.[7] The order proposed by the defendants would require that all documents filed in

this action be sealed and would prohibit disclosure of information obtained through discovery to anyone other than a party to this action and that party's authorized representatives and attorneys. Disclosure to third parties of information not obtained through the Court's processes or of information in a party's possession prior to the inception of this lawsuit, however, would be permitted.[8] For the reasons stated below, this motion is denied.

## I. Rule 26(c) and the First Amendment

For many years, the rules governing the conduct of litigation reflected the notion

Journal, the daily newspaper of the American Banking Association, and at least one Rockland County newspaper.

4. The plaintiff was interviewed on the Today show, WABC–TV's Eyewitness News, and WNBC–TV's News Four New York.

5. One of the plaintiff's attorneys was interviewed on WINS radio on August 13, 1981.

6. For example, the headlines appearing in the New York Daily News and the New York Post included "Sex and the bank veep," "No sex, no job, woman charges," " 'Bank boss forced me to have sex,' " "Sexploited and fired: exec," and " 'I've had it with men.' "

7. *Amicus* briefs have been filed on behalf of News Group Publications, Inc., the corporate publisher of the New York Post, New York News, Inc., the publisher of the Daily News, and Dow Jones & Co., Inc., the publisher of the Wall Street Journal.

8. The text of the defendants' proposed order reads as follows:
"1. All documents served or filed with the Court and all transcripts made of proceedings herein shall bear the following legend in the upper right-hand corner of the first page of such document:
'CONFIDENTIAL
THIS MATERIAL SHALL BE TREATED CONFIDENTIAL AND CAN ONLY BE USED IN ACCORDANCE WITH THE PROTECTIVE ORDER OF THIS COURT.'
"2. All documents of any kind that either party wishes to file with the Court shall be filed in sealed envelopes or other appropriate sealed containers on which shall be endorsed the title of this action, an indication of the nature of the contents of such sealed envelope or other container, the word 'Confidential,' and a statement substantially in the following form: 'This envelope is sealed pursuant to order of the Court and contains confidential information filed in

the case by [name of party who is filing] and is not to be opened or the contents thereof to be displayed or revealed except by order of the Court.'
"3. Information or documents obtained through discovery or other proceedings herein may not be used for any purpose other than this litigation and may not be disclosed, directly or indirectly, to any person other than: any party to this action and that party's authorized employees, agents and representatives; and any attorney or firm of attorneys for a party to this action and his or their partners, associates, co-counsel and authorized employees, agents and representatives. Each person to whom information or documents is disclosed shall be bound by the terms of this Order. Such information or documents shall not be disclosed to any person unless such person has first been provided with a copy of this Order and signs an agreement in the form annexed hereto as Exhibit A.
"4. Information or documents in a party's possession prior to the commencement of this action or obtained during its pendency otherwise than in the course of proceedings herein may be disclosed to third persons by that party, but, in disclosing said information or documents, the party shall not quote, refer to, or attribute statements to any document served or filed with the court or any proceedings herein.
"5. At the conclusion of the proceedings herein (including appeals, if any), all documents served or filed with the Court and all transcripts made of proceedings herein, together with any and all copies, extracts and summaries thereof, shall be returned to the parties from whom they originated and the information contained in said documents shall not be disclosed other than in accordance with the terms of this Order which shall continue in full force and effect.
"6. This Order may be amended by subsequent order of the Court upon notice to the parties."

that a trial "was a battle of wits rather than a search for the truth," 8 C. Wright & A. Miller, Federal Practice and Procedure § 2001, at 14 (1970). Consequently, the courtroom was often the place in which a litigant first learned the details of his adversary's case. A basic shift in philosophy occurred with the advent of the discovery provisions of the Federal Rules of Civil Procedure. No longer were parties expected to embark upon a trial with only the barest knowledge of the facts and the hope that their superior advocacy skills would allow them to prevail. Rather, the discovery rules were designed to ensure that a trial was "less a game of blindman's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958); *accord, Hickman v. Taylor*, 329 U.S. 495, 501, 67 S.Ct. 385, 388, 91 L.Ed. 451 (1947) ("[C]ivil trials in the federal courts no longer need be carried on in the dark. The way is now clear, consistent with recognized privileges, for the parties to obtain the fullest possible knowledge of the issues and facts before trial." (footnote omitted)).

To achieve these goals, the discovery rules allow litigants a broad right of access to information. For example, a party can seek not only information that can be used as evidence at trial, but also information that "appears reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). To avoid potential abuse of this broad right, however, the rules invest the trial court with discretionary authority to control the discovery process. 8 C. Wright & A. Miller, *supra*, § 2036, at 267–68. Thus, Rule 26(c) authorizes a court, upon a showing of good cause, to "make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c).[9]

Rule 26(c) "emphasizes the complete control that the court has over the discovery process." 8 C. Wright & A. Miller, *supra*, § 2036, at 267. Recently, however, there has been recognition of a potential conflict between this power to supervise discovery and the First Amendment. In *In re Halkin*, 598 F.2d 176 (D.C.Cir.1979), and *In re San Juan Star Co.*, 662 F.2d 108 (1st Cir. 1981), the D.C. Circuit and the First Circuit held that an order precluding dissemination of information obtained as a result of discovery implicates First Amendment interests and that the good cause standard embodied in Rule 26(c) does not protect those interests sufficiently. Consequently, both circuits adopted standards that supposedly provide greater protection for a litigant's First Amendment interests.

■ The present motion raises questions in this now controversial and relatively uncharted area of the law.[10] Before turning

---

**9.** Rule 26(c) provides that

> [u]pon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition, the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the discovery not be had; (2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place; (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery; (4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters; (5) that discovery be conducted with no one present except persons designated by the court; (6) that a deposition after being sealed be opened only by order of the court; (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way; (8) that the parties simultaneously file specified documents or information enclosed in sealed envelopes to be opened as directed by the court.

Fed.R.Civ.P. 26(c).

**10.** This motion also raises the question whether the public and the media have a First Amendment right of access to pretrial discovery materials. *Amici* imply that such a right exists, and in support of this proposition, they appear to rely primarily on *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). Although our disposition of this motion makes resolution of this question

to the merits of this motion, therefore, it is appropriate to discuss this controversy and the legal principles that will guide our course.

### A. The First Amendment Interest In Disseminating Information Obtained Through Discovery

■ It appears fair to conclude that litigants and their lawyers have a First Amendment interest in disseminating information procured through discovery. *In re San Juan Star Co., supra*, at 115; *National Polymer Products, Inc. v. Borg-Warner Corp.*, 641 F.2d 418, 423 (6th Cir. 1981); *In re Halkin, supra*, 598 F.2d at 187–91, *see id.* at 206 (Wilkey, J., dissenting) (although it is

unnecessary, we observe that *Richmond Newspapers* does not seem to support such a proposition.

*Richmond Newspapers* was a plurality decision in which the Court established a First Amendment right to attend criminal trials. The decision, at least for a majority of Justices, was premised on two related considerations. *See* 448 U.S. at 558, 100 S.Ct. at 2818 (opinion of Chief Justice Burger with whom Justices White and Stevens joined); 448 U.S. at 584, 100 S.Ct. at 2831 (opinion of Justice Brennan with whom Justice Marshall joined). The first was the enduring tradition of public criminal trials in both England and the United States. 448 U.S. at 563–75, 100 S.Ct. at 2820–26 (Burger, C. J.); *id.* at 589–93, 100 S.Ct. at 2834–36 (Brennan, J.). The second is the importance of public access in advancing several purposes of the trial process itself. *Id.* at 563–75, 100 S.Ct. at 2820–26 (Burger, C. J.); *id.* at 593–97, 100 S.Ct. at 2836–38 (Brennan, J.). For example, an open trial assures a fair and accurate adjudication, *id.* at 593, 100 S.Ct. at 2836 (Brennan, J.), by discouraging "perjury, the misconduct of participants, and decisions based on secret bias or partiality." *Id.* at 569, 100 S.Ct. at 2823 (Burger, C. J.). Additionally, allowing public observation of a trial can foster the appearance of justice, *id.* at 572, 100 S.Ct. at 2825 (Burger, C. J.); *id.* at 594, 100 S.Ct. at 2837 (Brennan, J.)—a necessity for the effective functioning of the judicial process. *Id.* at 571–72, 100 S.Ct. at 2824–25 (Burger, C. J.). A similar argument cannot be made for pretrial discovery materials. In both England and the United States, there is no enduring tradition of public access to pretrial proceedings. *Gannett Co. v. DePasquale*, 443 U.S. 368, 387–91, 99 S.Ct. 2898, 2909–11, 61 L.Ed.2d 608 (1979); *id.* at 396–97, 99 S.Ct. at 2913–14 (Burger, C. J., concurring); *Times Newspapers Ltd. v. McDonnell Douglas Corp.*, 387 F.Supp. 189, 194–97 (C.D.Cal.1974). Moreover, the second consideration that the

argued that a Rule 26(c) order that restricts expression can be entered upon the mere showing of good cause, the existence of a First Amendment interest is not seriously disputed); 92 Harv.L.Rev. 1550, 1554 (1979) (same). All persons have an interest in communicating ideas and information to others, *In re San Juan Star Co., supra*, at 115, regardless of the manner in which the information was acquired. *In re Halkin, supra*, 598 F.2d at 187–88; *accord, In re Upjohn Co. Antibiotic Cleocin Products Liability Litigation*, 81 F.R.D. 482, 486 (E.D. Mich.1979); *see Rodgers v. United States Steel Corp.*, 536 F.2d 1001, 1008 n.16 (3d Cir. 1976).[11] Moreover, one cannot state cate-

Court relied on is not applicable to pretrial discovery. The purposes of discovery are to narrow the issues for trial, to obtain evidence for use at trial, and to obtain information that will lead to relevant evidence. *In re Halkin*, 598 F.2d 176, 207 (D.C.Cir.1979) (Wilkey, J., dissenting); *see* Fed.R.Civ.P. 26–37. It is not clear that public access to pretrial discovery materials would advance these goals or otherwise have a beneficial effect on the discovery process. *See In re San Juan Star Co.*, at 115 (1st Cir. 1981); pt. I(A) *infra*.
Whether the public and the media have a common law right of access to discovery materials is a more difficult question. (In light of the fact that most civil actions are settled prior to trial, the issue is particularly challenging in the context of actions, such as the one at bar, brought pursuant to a Federal statute thought by Congress to involve important public interests.) Although this issue also need not be resolved at this time, we do note two things. First, the cases cited by *Amici* involved access to materials that had already been admitted into evidence at an open trial. *See United States v. Criden*, 648 F.2d 814 (3d Cir. 1981); *In re National Broadcasting Co.*, 635 F.2d 945 (2d Cir. 1980); *United States v. Mitchell*, 551 F.2d 1252 (D.C.Cir.1976), *rev'd on other grounds sub nom. Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). Second, "the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978).

11. The *Halkin* court reasoned that, if an individual retains a First Amendment interest in disseminating "information [that] has been sto-

gorically that the fruits of discovery fall within one of the traditional classifications of speech unprotected by the First Amendment. *In re Halkin, supra,* 598 F.2d at 188. Although discovery could sometimes yield unprotected matter, it can also reveal information that "lies near the heart of . . . the First Amendment." *Id.* For example, if a request for documents, *see* Fed.R.Civ.P. 34, resulted in material that exposed the corrupt workings of a government agency, the party receiving the documents would certainly have a First Amendment interest in disseminating this information. Finally, the First Amendment rights of litigants and lawyers are not checked at the door of the courthouse upon the commencement of litigation, *National Polymer Products, Inc. v. Borg-Warner Corp., supra,* 641 F.2d at 423; *In re Halkin, supra,* 598 F.2d at 187; *see Chicago Council of Lawyers v. Bauer,* 522 F.2d 242, 258 (7th Cir. 1975) (courts "should be extremely skeptical about any rule that silences [an attorney's] voice"), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976), and in particular, these rights are not waived when the parties embark upon the discovery process. *In re Halkin, supra,* 598 F.2d at 188–90. *But cf. Rodgers v. United States Steel Corp., supra,* 536 F.2d at 1006 (court "assume[d] *arguendo* that if the district court had prohibited disclosure only of information derived from the discovery processes, its order would have been constitutional" because "[i]t may well be" that First Amendment rights are waived when parties take advantage of discovery). As the *Halkin* court noted, "we [do not] find clear and compelling evidence of an implied waiver of First Amendment rights in the system of civil discovery," *In re Halkin, supra,* 598 F.2d at 189, because, absent a protective order, the discovery rules allow a party to use discovery materials "for any purpose, including dissemination to the public." *Id.* at 188, *see id.* at 189 (clear and compelling circumstances must be shown to establish waiver of First Amendment rights).

Another point that is seemingly undisputed is that the nature of this First Amendment interest is somewhat limited, and thus, a Rule 26(c) order restricting expression should not be evaluated by the stringent standards governing classic prior restraints. *In re San Juan Star Co., supra,* at 114–115; *In re Halkin, supra,* 598 F.2d at 206 (Wilkey, J., dissenting); *see id.* at 182–91 (majority opinion) (no express statement that the First Amendment interests were limited, but a standard less stringent than that governing prior restraints was adopted). *But see Reliance Insurance Co. v. Barron's,* 428 F.Supp. 200, 204 (S.D.N.Y.1977) (in denying a request for a Rule 26(c) order restricting the dissemination of discovery materials, court characterized the proposed order as a prior restraint). *See generally* Note, *Rule 26(c) Protective Orders and the First Amendment,* 80 Colum.L.Rev. 1645, 1654–60 (1980) [hereinafter cited as *Protective Orders* ]; 92 Harv.L.Rev. 1550, 1554–57 (1979). Prior restraints are rarely upheld because they are viewed as "the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Association v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976). They are usually associated with administrative licensing schemes and judicial orders that forbid one from communicating about particular matters. *In re Halkin, supra,* 598 F.2d at 183–84 & nn.14&15; *see Nebraska Press Association v. Stuart, supra; Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). For example, an order barring the press from publishing anything about a lawsuit would most likely be termed a prior restraint. *See Nebraska Press Association v. Stuart, supra.*

Although Rule 26(c) orders that restrict expression are similar in form to other orders that have been characterized as prior restraints, *compare In re San Juan Star Co., supra,* at 111 *with Nebraska Press Association v. Stuart, supra,* 427 U.S. at

---

len, or retained in violation of a security agreement," he should retain such an interest when the information he seeks to communicate was

obtained through discovery. *In re Halkin, supra,* 598 F.2d at 187–88 (citations omitted).

542, 96 S.Ct. at 2794, the special nature of discovery as a source of information justifies a reduced level of scrutiny. *In re San Juan Star Co., supra*, at 115; *In re Halkin, supra*, 598 F.2d at 206–08 (Wilkey, J., dissenting); *see Protective Orders, supra*, at 1654 (one's interest in disseminating information procured through discovery is similar to that of "persons who are under government control to a greater extent than the general public" and whose First Amendment "rights may be infringed to a greater extent than those of the general public" because of "the government's need to maintain control over its own institutions"). First, a stringent standard that precludes issuance of virtually all Rule 26(c) orders restricting expression could have a pernicious effect on the smooth functioning of the discovery system. *In re San Juan Star Co., supra*, at 115. One of the purposes of discovery is to expedite the conduct of litigation. *Id.*, at 115. Moreover, the entire system is premised on cooperation between the parties, that is, voluntary compliance with discovery requests without the constant supervision of a judge or magistrate. Dore, *Confidentiality Orders—The Proper Role of the Courts in Providing Confidential Treatment for Information Disclosed Through the Pre-Trial Discovery Process*, 14 N.Eng.L.Rev. 1, 6 (1978). If it is extremely difficult to obtain an order restricting dissemination of discovery materials, however, a litigant may be discouraged from complying with discovery requests voluntarily when he perceives that his interests will be harmed by public disclosure of the requested information. This would force the other party to seek sanctions or a court order compelling disclosure. *See* Fed.R.Civ.P. 37. A series of such occurrences would delay the discovery process considerably and amount to an undue burden on the resources of the judiciary and the litigants. Similarly, if it is difficult to protect litigants from injury as a result of disclosure, judges may be apt to deny access to discovery materials altogether. *In re San Juan Star Co., supra*, at 115. This could subvert the goal of allowing "parties to obtain the fullest possible knowledge of the issues and facts before trial." *Hickman v. Taylor, supra*, 329 U.S. at 501, 67 S.Ct. at 389 (footnote omitted).

Second, the nature of discovery makes it unfair to allow the recipient of discovery materials the virtually unlimited right to disseminate those materials. As noted above, the discovery rules are very liberal and accord litigants a broad right of access to information. *See* Fed.R.Civ.P. 26(b). Consequently, production of much irrelevant and inadmissible information could be compelled by the processes of the court. As the First Circuit noted,

> [s]uch undigested matter, forced from the mouth of an unwilling deponent, is hardly material encompassed within a broad public "right to know". Its disclosure would not advance the informed civic and political discussion that the First Amendment is intended to protect. We do not see present in the case of civil discovery those interests that make publicity in a criminal trial an important "safeguard against any attempt to employ our courts as instruments of persecution." Nor can the discovery processes lay claim to the long tradition of openness enjoyed by criminal or civil trials. We conclude, therefore, that although there is a First Amendment interest in information produced at trial that warrants full protection, a judicially-powered process compelling information that has not yet passed through the adversary-judicial filter for testing admissibility does not create communications that deserve full protection.

*In re San Juan Star Co., supra*, at 115 (citations omitted). It seems only fitting that a court should be allowed to exercise reasonable control over information that it has compelled a litigant to disclose. *See In re Halkin, supra*, 598 F.2d at 206–08 (Wilkey, J., dissenting) (Because access results from a system that reserves to the court the power to restrict the use of discovered information, the litigant obtains only a limited interest in information received through the discovery system, that is, he accepts it subject to the possibility that the court may restrict its use.).

## B. The Standards for Protecting the First Amendment Interest

The major area of disagreement concerns what showing must be made to justify an infringement on this somewhat limited First Amendment interest. Three standards have been utilized: the good cause standard of Rule 26(c), the *Halkin* standard, and the *San Juan Star* standard.

The ostensibly strictest test was enunciated by the D.C. Circuit in *In re Halkin, supra.*[12] Because of its view that a restriction on dissemination of discovery materials "constitutes direct governmental action limiting speech," *id.* at 183, the court concluded that such an order can be entered only after "close scrutiny of its impact on protected First Amendment expression." *Id.* at 186. Specifically, it adopted a two-tiered approach. The initial inquiry is to determine the nature of the restraint. "An order restraining publication of official court records open to the public, or an order restraining political speech, implicates different

ent interests than an order restraining commercial information." *Id.* at 191 (footnotes omitted). The next step is for the court to determine if three criteria have been satisfied. First, the nature of the harm threatened by dissemination must be substantial and serious. *Id.* at 191, 192–93.[13] There must be a "specific showing that dissemination of the discovery materials would pose a concrete threat to an important countervailing interest." *Id.* at 193 (footnote omitted).[14] Second, the order must be narrowly drawn and precise. *Id.* at 191, 193–95. Third, there must be no alternative means of avoiding the harm that will be less restrictive of expression. *Id.* at 191, 195.

In attempting to strike a balance between the First Amendment interests of litigants and society's interest in the effective operation of the discovery system, the First Circuit, in *In re San Juan Star Co., supra*, adopted a standard that is described as midway between the *Halkin* standard and one of good cause. At 116.[15] Before

---

12. *Halkin* was a non-jury case in which the plaintiffs sued the Federal Government for alleged violations of their constitutional and statutory rights arising from a program of government surveillance. Pursuant to a discovery request, the Government provided the plaintiffs with documents relating to the surveillance operation. No protective order was sought, and there was no agreement between the parties concerning the use of the documents. (The Government, however, had deleted "sensitive" information before delivering the documents.) Shortly after receiving the documents, the plaintiffs informed the defendants that they intended to make the documents available to the public. In response, the defendants moved for a Rule 26(c) order "restraining the parties and their counsel from publicly disclosing information obtained through discovery." *In re Halkin, supra*, 598 F.2d at 182. They argued that public disclosure would compromise their right to a fair adjudication of the issues. Although this motion was unsupported by affidavits or other evidence, the district court issued the protective order. The Court of Appeals reversed because issuance of the order was based upon a mere finding of good cause. *See id.* at 179–82.

13. In his dissenting opinion, Judge Wilkey argued that the majority would not consider " 'annoyance, embarrassment and harassment' " to be proper grounds for issuing a Rule 26(c) order that restricts expression. He wrote that "[i]t is hard to conceive of a situation

where the majority would allow such interests ... to outweigh the 'overriding' interests in First Amendment expression asserted to be present." *In re Halkin, supra*, 598 F.2d at 211 (Wilkey, J., dissenting). It should be noted, however, that, although the majority never spoke of such interests as being a sufficient reason to enter a Rule 26(c) order, it did note that "[w]idely varying interests have been advanced in support of restraining orders," *id.* at 192, and that trial courts should maintain some flexibility when determining the propriety of an order that restricts the dissemination of discovery materials.

14. The court "stress[ed] that the mere allegation of conjectural harm is insufficient to meet the moving party's burden." *In re Halkin, supra*, 598 F.2d at 194 n.42.

15. In *San Juan Star*, relatives of two suspected Puerto Rican terrorists who had been killed in a shootout with police brought a federal civil rights action in the District of Puerto Rico, alleging that government officials had conspired to arrange the killings. Because the shooting was one of the most controversial events "in recent Puerto Rico history," the lawsuit received intense media coverage and generated much public interest. For example, the depositions of the defendants were reported, and both sides then attempted to explain the testimony to the press. Consequently, the dis-

issuing a protective order that restricts the dissemination of information obtained through discovery, three factors must be considered. First, the trial court must look to the magnitude and imminence of the threatened harm. *Id.*, at 116. In considering this factor, however, the trial court should maintain a good degree of flexibility by viewing the magnitude and imminence of harm "on a sliding scale: as the potential harm grows more grave, the imminence necessary is reduced." *Id.*, at 116. The court characterized this standard as one of " 'good cause' that incorporates a 'heightened sensitivity' to the First Amendment concerns at stake." *Id.*, at 116. Second, the court must be reasonably certain that the protective order will prevent the threatened harm. *Id.*, at 116. Third, the restraint must be the least restrictive means of avoiding the harm. *Id.*, at 116.

The third standard that can be used when considering the propriety of a protective order that will limit expression is, of course, the good cause standard embodied in Rule 26(c). *See In re Halkin, supra* (Wilkey, J., dissenting). Good cause is a rather amorphous concept, not amenable to precise definition. Nevertheless, a few general observations can be made.

 Good cause is a highly discretionary standard. *Id.* at 210 (Wilkey, J., dissenting); *Protective Orders, supra*, at 1659. Its application can perhaps best be conceptualized as a two step process. Initially, the moving party must show that a "clearly defined and very serious injury" will result if a protective order is not issued. *United States v. International Business Machines Corp.*, 67 F.R.D. 40, 46 (S.D.N.Y.1975) (emphasis deleted); *accord, Lucido v. Cravath, Swaine & Moore*, 25 F.R.Serv.2d 1050, 1052 (S.D.N.Y.1978); *Reliance Insurance Co. v. Barron's, supra*, 428 F.Supp. at 202–03.

The showing necessary to establish such potential harm depends upon the type of harm being threatened and the type of order being sought. *In re Halkin, supra*, 598 F.2d at 210 (Wilkey, J., dissenting); 4 Moore's Federal Practice ¶ 26.68, at 26-491 (2d ed. 1981). At the least, the moving party must provide the court with "information from which it can reasonably conclude that the nature and magnitude of the moving party's interest are such that protective intervention by the court is justified." *In re Halkin, supra*, 598 F.2d at 211 (Wilkey, J., dissenting).

Once such a showing has been made, the court should consider other factors that may militate against issuing a protective order.[16] *United States v. Hooker Chemicals & Plastics Corp.*, 90 F.R.D. 421, 425 (W.D.N.Y.1981). For example, it should consider whether the order will prevent the threatened harm, whether there are less restrictive means of preventing the threatened harm, the interests of the party opposing the motion, and the interests of the public. In the context of a motion to prevent dissemination of information obtained through discovery, it is appropriate to consider the other party's First Amendment interests, the nature of the information, and whether the public has an interest in learning of that information.

It is interesting to note that, when using the good cause standard, a court may consider factors similar, if not identical, to those mandated by *Halkin* and *San Juan Star*. A significant difference among the three, however, lies in the discretionary nature of the good cause standard. In determining whether there is good cause to enter a Rule 26(c) order, a court may, but does not have to, weigh these factors. Moreover, because a determination that good cause has been shown is reviewed under an

---

trict court entered several orders, one of which forbade "attorneys from disclosing any evidence obtained through subsequent depositions to the press ... or to any third party." *In re San Juan Star Co., supra*, at 111. The San Juan Star Co., a newspaper, intervened in the lawsuit and challenged the order. The Court of Appeals affirmed. *See id.*, at 118.

**16.** The Court can also consider factors that may tip the scales toward issuing a protective order—for example, whether the litigant's motive for disseminating the information constitutes "an abuse of the discovery process." *National Polymer Products, Inc. v. Borg-Warner Corp., supra*, 641 F.2d at 424.

abuse of discretion standard, it is less likely that the appellate court would substitute its judgment for that of the trial court even if, for example, it believed that more deference should have been given to the other party's First Amendment interests. Under either of the "heightened" standards, on the other hand, the court must find that definite criteria have been satisfied before issuing a protective order, and failure to do so will result in a reversal. To the extent that the discretion of the trial court is limited by these "heightened" standards, therefore, they do provide more protection for a litigant's First Amendment rights. *See Brink v. DaLesio,* 82 F.R.D. 664, 678 (D.Md.1979).

■ The controversy about what standard should be used is not easily resolved and, indeed, could expand. If other circuits conclude that the good cause standard does not protect a litigant's First Amendment interests sufficiently, for example, differing views of the strength of that interest or exigencies of policy could result in the adoption of standards different from those now used by the First Circuit and the D.C. Circuit. This would further cloud already murky waters. At the present time, however, we need not resolve the questions whether the good cause standard is constitutionally deficient and, if so, what standard should be used,[17] for we conclude that there is not good cause to issue the protective order proposed by the defendants. *Cf. Gulf Oil Co. v. Bernard,* —— U.S. ——, ——, 101 S.Ct. 2193, 2198, 68 L.Ed.2d 693 (1981) ("prior to reaching any constitutional questions, federal courts must consider non-constitutional grounds for decision").

II. Good Cause Applied

In determining whether there is good cause to issue a Rule 26(c) order that pro-

hibits the dissemination of discovery materials, the initial inquiry is whether the moving party has shown that disclosure of the information will result in a "clearly defined and very serious injury." *United States v. International Business Machines Corp., supra,* 67 F.R.D. at 46 (emphasis deleted), *see* pt. I(B) *supra.* As a result of the plaintiff's decision to publicize her allegations against the defendants last August, the Bank claims that it and its employees suffered embarrassment and injury to reputation. Ross claims that the dissemination of this information had injurious effects on his business and personal life, and he cites specific examples. First, his consulting business, which he began in February 1981 and which had grown steadily since its inception, experienced a lull in growth during the late summer and early fall. Second, two of his corporate clients expressed concern about the desirability of maintaining a business relationship in light of the charges. Neither, however, has terminated the relationship. Third, two potential clients with whom he had been negotiating informed him that they "felt it appropriate to await further developments before they made a decision" on whether to retain the services of his firm. Ross Affidavit ¶ 6. Fourth, an appointment to a teaching position, which he was scheduled to receive last summer, was delayed until the fall. Fifth, he suffered from "heightened blood pressure" and insomnia for a time after the plaintiff publicized her allegations. Sixth, his relationship with his wife, whom he married in February 1981, his ex-wife, and his son became strained. Finally, he received harassing and threatening phone calls. The defendants believe it "self-evident" that there

---

17. The defendants suggest that all that is needed to enter an order that precludes the dissemination of information obtained through discovery in the Second Circuit is a showing of good cause. In support of this proposition, they cite Judge Friendly's statement that "we entertain no doubt as to the constitutionality of a rule allowing a federal court to forbid the publicizing, in advance of trial, of information obtained by one party from another by use of the court's processes." *International Products*

*Corp. v. Koons,* 325 F.2d 403, 407 (2d Cir. 1963). Although the Second Circuit may yet hold that the good cause standard protects a litigant's First Amendment interests sufficiently, we do not believe that such a conclusion is mandated by *Koons. See In re Halkin, supra,* 598 F.2d at 189 ("At most, [this passage] establishes that a properly drawn restraining order, supported by a proper showing of good cause, is compatible with the First Amendment." (footnote omitted)).

will be a recurrence of these injuries if the plaintiff is permitted to disseminate the fruits of discovery.

Even if it is assumed that these injuries will reoccur and that they are sufficiently "defined and serious,"[18] other factors militate against issuing the protective order proposed by the defendants. Our first concern is the breadth of the proposed order, which would prohibit dissemination of discovery materials that are as yet non-existent. The defendants argue that the proposed order is the only way to prevent dissemination of information that may injure their interests. Failure to issue this order would, according to the defendants, have the effect of "shut[ting] the barn door after the horses have left." Defendants' Joint Memorandum of Law in Further Support of Their Motion and in Reply to the Opposing Memoranda of Amici at 3. We disagree.

The circumstances of a particular case may sometimes warrant an order restricting dissemination of discovery materials before the court even knows the contents of those materials. See In re Halkin, supra, 598 F.2d at 196 n.47 (court recognized that, in some instances, an order similar to the one proposed by the defendants could be appropriate). In San Juan Star, for example, the First Circuit upheld an order prohibiting dissemination of information contained in subsequent depositions. The court, however, emphasized that this "arguably overbroad" order was justified only because the unusual circumstances of the case made it probable that "any additional publicity of deposition contents would be damaging to the defendants' fair trial rights." In re San Juan Star Co., supra, at 117 (emphasis in original).

At this time, there are no exigencies that warrant such a sweeping order in this case. Unlike San Juan Star, in which any publicity would have harmed the defendants, the goal in this case is to prohibit the disclosure only of information that will embarrass or otherwise injure the defendants. This end can be achieved by using less drastic alternatives; in other words, the barn door can be shut before the horses have left. For example, if the defendants believe that a document request would yield information that should not be disseminated to the public, they can present the specific documents to the Court and move for a protective order. Similarly, if they want to restrict the dissemination of specific deposition testimony, they can make a motion prior to or during the taking of the deposition. If the Court is convinced that information, truly worthy of protection, may be revealed, it will prohibit dissemination until it has reviewed the transcript of the deposition.[19] Although this may prove burdensome to the Court, it seems "desirable . . . to review the contents of each deposition individually, restricting dissemination of only such information as [is] found specifically likely to [cause injury to the defendants]." In re San Juan Star, supra, at 117; see United States v. International Business Machines Corp., 82 F.R.D. 183, 185 (S.D.N.Y.1979).[20]

18. It should be noted that mere conclusory allegations that the Bank and its employees have been and will be injured are not the most appropriate means of establishing that a protective order is warranted. See C. Wright & A. Miller, supra, § 2035, at 265.

19. Admittedly, unforeseen information may be revealed at a deposition. If this occurs and if the defendants inform the plaintiff that they would like to move for a protective order, we trust that the plaintiff and her attorneys will follow the spirit of this opinion and not publicize the information until the defendants have had an opportunity to make the motion, and the Court has had an opportunity to rule on it.

20. The defendants dismiss the problems of overbreadth by pointing out that, even if the order is issued, "[i]f there is any legitimate need for disclosure of information to third persons, an order permitting such disclosure can always be sought." Maneker Affidavit ¶ 4. Several observations about this argument are in order. The premise underlying Rule 26(c) is that all discovery materials can be disseminated unless the moving party shows good cause why specific information should remain confidential. By issuing the proposed order, we would be altering the premise, that is, all discovery materials could not be disclosed unless the plaintiff or a third party applied to the Court for a modification of the order. Although, as stated above, such a course of ac-

It is also not apparent that the proposed order would eliminate the possibility of harm to Ross's personal and professional interests—harm that will allegedly be caused by the plaintiff's disclosure of information concerning Ross's sexual behavior. The order, although it precludes the dissemination of information obtained through discovery, does not prohibit the dissemination of information that was in a party's possession prior to the inception of this lawsuit. Because the plaintiff obviously would have known the details of her alleged relationship with Ross before the lawsuit, she will be able to disseminate this information regardless of the order.

The relative importance to this lawsuit of information concerning any sexual relationship between Koster and Ross is another factor that leads us to deny the defendants' motion. Ordinarily, one's privacy interest in preventing the public disclosure of the details of a sexual relationship might be viewed as a reason for granting a protective order. In this instance, however, the information is not irrelevant matter that was revealed as a by-product of the liberal discovery rules. Rather, the facts underlying the plaintiff's allegations that Ross forced her to have sex for the purpose of "safeguarding her career" and that he abused her when she terminated the relationship must be proven if the plaintiff is to prevail on her cause of action. In other words, this information is highly relevant to the issues in the lawsuit and will be revealed at a trial on the merits, assuming that there is one. Thus, the defendants' privacy interest in the information is significantly reduced by the likelihood that the information will eventually be disclosed.[21] *See Protective Orders, supra,* at 1663 ("If the information will be disclosed eventually in any case, there is no reason to prevent disclosure at the discovery stage." (footnote omitted)); *cf. Lucido v. Cravath, Swaine & Moore, supra,* 25 F.R.Serv.2d at 1051 (protective order covered only that information that "would, or at a minimum, might not be admissible at trial").

These are but some of the reasons that, when taken together, lead this Court to the conclusion that issuance of this proposed order at this particular juncture of the lawsuit is not warranted. By no means do we foreclose the possibility that some information revealed through discovery will be the proper subject of a narrowly drawn protective order.[22] Whether such information will be revealed, however, cannot be foretold. Rather, we must await the commencement of the discovery process.

One final point merits discussion. Throughout this opinion, we have dealt primarily with that portion of the proposed order that concerns the dissemination of discovery materials. The proposed order, however, also contains a provision requiring that all papers filed in this action be sealed.

Although the Court's inherent equitable powers unquestionably allow it to take this

tion may sometimes be proper, requiring that the plaintiff take the initiative is not warranted in view of our conclusion that the defendants' interests can be protected without a broad order. Additionally, it seems that before placing the inconvenience of applying to the Court for modification of the order on the plaintiff, the Court should at least be convinced that most information likely to be disclosed during discovery will be worthy of protection. In this case, we have some reservations in this regard.

**21.** Another related consideration is apposite. In determining the strength of one's privacy interest in particular information, it seems appropriate to consider the extent to which that information has been previously revealed. *See Protective Orders, supra,* at 1663; *cf.* W. Prosser, Handbook of the Law of Torts § 117, at 810 (To maintain an action for public disclosure of private facts, "[t]he facts disclosed to the public must be private facts, and not public ones."). Thus, the strength of Ross's privacy interest in preventing disclosure of information concerning his alleged sexual relationship with the plaintiff is decreased by the plaintiff's earlier revelations to the press.

**22.** There is also the possibility that media coverage will become so intense that the defendants' right to have the issues adjudicated fairly will be threatened. This, however, seems unlikely. It should also be noted that the penchant of the plaintiff to try her case in the media may become a consideration in determining the scope of discovery to be afforded her.

course of action, *International Products Corp. v. Koons*, 325 F.2d 403, 407–08 (2d Cir. 1963), sealing is not appropriate at this time. No purpose would be served by sealing depositions and other discovery materials that must be filed with the Court in view of our refusal to preclude dissemination of the information contained in these papers. Nor is the sealing of the pleadings, legal memoranda, and affidavits in support of this motion warranted. The information contained in these papers either has been substantially disclosed already or is not of the type that, if disclosed, will result in serious harm to the defendants' interests. Of course, if, in the future, any party believes that a particular document should be sealed, the appropriate motion can be made.

SO ORDERED.