[Nos. 47938-1, 48155-5.   En Banc.   December 2, 1982.]

KEITH MILTON RHINEHART, ET AL, *Respondents*, v. THE SEATTLE TIMES COMPANY, ET AL, *Petitioners*.

*Davis, Wright, Todd, Riese & Jones,* by *Evan L. Schwab* and *Bruce E. H. Johnson,* for petitioners.

*Edwards & Barbieri,* by *Malcolm L. Edwards* and *Robert G. Sieh,* for respondents.

*Gordon G. Conger, Robert B. Mitchell,* and *Susan D. Jones* on behalf of KIRO, Inc., amici curiae for petitioners.

ROSELLINI, J.—The Seattle Times published stories concerning the Aquarian Foundation and its leader, Rhinehart, who founded the organization in the 1950's. Articles about the foundation, a "spiritualist church", also appeared in the Walla Walla Union–Bulletin, describing some bizarre performances which were presented at a "religious presentation" staged for inmates at the state penitentiary at Walla Walla.

Rhinehart brought this action on behalf of himself and the foundation, seeking damages for defamation and invasion of privacy. He was joined by four members who participated in the Walla Walla presentation.

The defendants denied many of the allegations and asserted affirmative defenses including claims of privilege.

They undertook discovery with respect to the plaintiffs' financial affairs, membership and donors. This information was relevant upon the issues of truth and damages. It appears that the attorney for the defendants assured counsel for the plaintiffs that financial materials disclosed to him would be kept confidential. The defendants were provided with income tax returns of Rhinehart and some financial information relating to the other plaintiffs. The plaintiffs refused, however, to disclose other desired information, such as the present address of Rhinehart, who allegedly had fled the state because of threats to his life resulting from the publicity given the foundation by the defendants.

The defendants sought and were granted an order compelling discovery, and the plaintiffs obtained a protective order limiting the use which could be made of information derived through the discovery process. The order provided:

3. The defendants and each of them shall make no use of and shall not disseminate the information . . . which is gained through discovery, other than such use as is necessary in order for the discovering party to prepare and try the case. As a result, information gained by a defendant through the discovery process may not be published by any of the defendants or made available to any news media for publication or dissemination. This protective order has no application except to information gained by the defendants through the use of the discovery processes.

Clerk's Papers, at 26.

The plaintiffs objected to the order compelling discovery on the grounds that it invaded their right to privacy and freedoms of religion and association. The defendants attacked the protective order on the ground that it denied them freedom of the press and of speech, guaranteed by the first amendment to the United States Constitution and by Const. art. 1, § 5.

The trial court filed a memorandum opinion explaining the protective order. In that opinion it found that the defendants were entitled to make discovery under Superior

Court Civil Rule 26(b)(1) and that the plaintiffs had reasonable grounds for the issuance of a protective order in connection with information covered by the order. It also observed that if protective orders were not available, "it could have a chilling effect on a party's willingness to bring his case to court." The court said:

> If the absence of a Protective Order has the effect of denying a party access to the courts, this would be a result just as damaging to justice and to individual rights as can result from an impingement upon First Amendment rights. I would put access to the courts on an equal plane of importance with freedom of the press because it is through the courts that our fundamental freedoms are protected and enforced.

Clerk's Papers, at 63.

Both of the court's orders are before us on this discretionary review.

The gist of the defendants' theory in attacking the protective order is that CR 26(c) is unconstitutional insofar as it permits the court to limit the use which the press or its members can make of information which they have received through discovery, upon a mere showing of "good cause".

■ Under the federal constitution, persons engaged in the business or profession of publishing or otherwise communicating with the public are entitled to no greater protection than citizens who are not so engaged. Their right of access to information within the control of the government is the same. *Houchins v. KQED, Inc.,* 438 U.S. 1, 57 L. Ed. 2d 553, 98 S. Ct. 2588 (1978) (access to jails); *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 55 L. Ed. 2d 570, 98 S. Ct. 1306 (1978) (access to tapes not placed in evidence at trial); *Pell v. Procunier,* 417 U.S. 817, 41 L. Ed. 2d 495, 94 S. Ct. 2800 (1974) (access to prisons and inmates). *See Estes v. Texas,* 381 U.S. 532, 589, 14 L. Ed. 2d 543, 85 S. Ct. 1628 (1965) (Harlan, J., concurring).

Nor is there any basis for holding that a publisher, when he is a party to litigation, enjoys a greater immunity from protective orders than do other litigants, as the defendants

would have us hold. Neither the first and fourteenth amendments to the United States Constitution nor article 1, section 5 of our state constitution makes any distinction among citizens in conferring their protections.

Therefore, whatever power the courts have to enter protective orders to forestall the giving of unwanted publicity to the fruits of discovery, that power extends to all litigants.

The defendants maintain that a protective order which forbids publication of matters learned through discovery constitutes a "prior restraint on expression" which, while not unconstitutional per se, bears a "heavy presumption" against its validity. *See Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 43 L. Ed. 2d 448, 95 S. Ct. 1239 (1975). The Supreme Court in *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 49 L. Ed. 2d 683, 96 S. Ct. 2791 (1976) indicated that prior restraints "are the most serious and the least tolerable infringement on First Amendment rights." At common law the term "prior restraint" referred to a system of unreviewable administrative censorship or licensing. But the meaning has been extended through a long line of cases beginning with *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 75 L. Ed. 1357, 51 S. Ct. 625 (1931) to include judicial orders having an impact similar to administrative censorship.

The order here does restrain the publication of certain matters, although the restraint as to those items which are later admitted into evidence will terminate at that time. The restraint is not inspired by any governmental objection to the content of the publication, and the subject matter involves no element of advocacy or dissemination of ideas. We would be inclined to the view that these facts should lighten the burden of justifying the restraint. However, the United States Supreme Court has found prior restraints where the only matter involved was evidentiary materials derived from judicial proceedings. *See Nebraska Press Ass'n v. Stuart, supra; Smith v. Daily Mail Pub'g Co.,* 443 U.S. 97, 61 L. Ed. 2d 399, 99 S. Ct. 2667 (1979).

We do not believe that the prior restraint doctrine applies to protective orders. We do not reach this issue, however, because even under the prior restraint doctrine protective orders can be justified. Under this doctrine the burden of justifying the restraint rests primarily upon this court, inasmuch as it results from the implementation of CR 26(c), which we have adopted, using the federal rules (Fed. R. Civ. P. 26(c)) as its basis.

We must look then to the reasons for the rule and the nature of the interests involved to see if it is justified.

As the Supreme Court directed in *Nebraska Press Ass'n*, we must also examine whether the order here furthers those purposes and interests, whether other measures would be likely to mitigate the effects of the unwanted publicity involved here; and how effectively the protective order would operate to prevent the threatened harm.

With respect to the possibility of mitigation by other measures, the defendants suggest nothing other than denial of discovery altogether, which is admittedly within the power of the court. Since this would have the effect of closing access to the material sought to be published and denying the defendants the benefits of discovery, it is not a satisfactory alternative. As for the effectiveness of the protective order, it must be assumed that the defendants will abide by the court's order and, as will appear later, the evil against which the rule is directed is a litigant's disclosure of information furnished him in the discovery process. Our main inquiry, therefore, will concern the interests which justify a rule which authorizes protective orders in circumstances such as these. Such orders are meant to protect the health and integrity of the discovery process, as much as to protect the parties who participate in it.

CR 26 pertains to depositions and discovery. At common law opportunities for discovery were limited, as a result of which it was often said that trials were conducted "by ambush". Propounding interrogatories and obtaining documents were not authorized. *State ex rel. Bronson v. Superior Court,* 194 Wash. 339, 77 P.2d 997 (1938); *Puget Sound*

*Nav. Co. v. Associated Oil Co.,* 56 F.2d 605 (W.D. Wash. 1932). Some discovery was allowed in equity, but it did not come into its full flower until the promulgation of the federal rules and the adoption of these rules by the states. It is not disputed that without CR 26 the petitioners would have no right of access to the information which they claim a constitutional right to publish.

CR 26(b)(1) allows a broad scope of discovery, the only restrictions being that the matter must be relevant and not privileged. CR 26(c) provides that upon "good cause shown" the court may make "any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense". There is no dispute that this authorization is broad enough to permit the court to restrain use of discovery information for unauthorized purposes. The purpose of the rule is to enable the parties to prepare their cases for trial.

Chief Justice Warren, in a foreword to W. Glaser, *Pretrial Discovery and the Adversary System* (1968) said:

> The pretrial discovery rules have attempted to remove secrecy and surprise from the trial, thus presenting the fact–finder with a less dramatic, but more accurate, presentation of information. Proponents assert that the rules have proved successful in this regard. Yet there has been widespread debate and disagreement about whether the discovery rules, on balance, have improved the adversary system. Critics have doubted whether the benefits have been achieved, and have charged that discovery is unduly expensive and promotes delay and harassment.

It is toward the amelioration of these problems, among others, that CR 26(c), providing for protective orders, was directed. Under this rule the trial court exercises a broad discretion to manage the discovery process in a fashion that will implement the goal of full disclosure of relevant information and at the same time afford the participants protection against harmful side effects. 4 J. Moore, *Federal Practice* ¶ 26.67, at 26–487 (2d ed. 1982). Unfavorable publicity is one of such "harmful side effects". 4 J. Moore, *supra* ¶ 26.73; *see also* ¶ 26.74.

In *International Prods. Corp. v. Koons,* 325 F.2d 403, 407 (2d Cir. 1963), the Second Circuit Court of Appeals, speaking through Judge Friendly, said:

> [W]e entertain no doubt as to the constitutionality of a rule allowing a federal court to forbid the publicizing, in advance of trial, of information obtained by one party from another by use of the court's processes.[1]

In *National Polymer Prods., Inc. v. Borg–Warner Corp.,* 641 F.2d 418, 424 (6th Cir. 1981) (a case in which the parties had consented to a protective order), the Court of Appeals said:

> An important purpose of a pre–trial protective order is to preserve the confidentiality of materials which are revealed in discovery but not made public by trial.

As for matters which were admitted in evidence at the trial, however, the court held that the right to publish these, once they had become a matter of public record, was protected by the First Amendment, although the right could be waived. *See also Nichols v. Philadelphia Tribune Co.,* 22 F.R.D. 89 (E.D. Pa. 1958).

*Martindell v. ITT,* 594 F.2d 291 (2d Cir. 1979) was a civil suit in which the federal government attempted to gain access to depositions of witnesses for criminal investigative purposes. Holding that the lower court correctly withheld these depositions in order to protect the witnesses' Fifth Amendment rights and to enforce a stipulation that the information should remain confidential, the Court of Appeals said:

> These [the government's] arguments ignore a more significant counterbalancing factor—the vital function of a protective order issued under Rule 26(c), F.R.Civ.P., which is to "secure the just, speedy, and inexpensive determination" of civil disputes, Rule 1, F.R.Civ.P., by encouraging full disclosure of all evidence that might conceivably be relevant. This objective represents the

---

[1]A more restrictive view was taken by two members of a 3–judge panel of the District of Columbia Court of Appeals in *In re Halkin,* 598 F.2d 176 (D.C. Cir. 1979), strongly relied upon by the defendants here. That case and others which have adopted its holding will be discussed later.

cornerstone of our administration of civil justice. Unless a valid Rule 26(c) protective order is to be fully and fairly enforceable, witnesses relying upon such orders will be inhibited from giving essential testimony in civil litigation, thus undermining a procedural system that has been successfully developed over the years for disposition of civil differences. In short, witnesses might be expected frequently to refuse to testify pursuant to protective orders if their testimony were to be made available to the Government for criminal investigatory purposes in disregard of those orders.

*Martindell,* at 295–96.

That same court said in *Galella v. Onassis,* 487 F.2d 986 (2d Cir. 1973) that the grant and nature of protection is singularly within the discretion of the trial court and may be reversed only on a clear showing of abuse of discretion.

In order to prevent the revelation of trade secrets, a court may properly exact from the party seeking this information assurances under oath that none of the information obtained will be divulged except in the course of judicial proceedings. *Paul v. Sinnott,* 217 F. Supp. 84 (W.D. Pa. 1963).[2]

Thus, the rule has generally been given effect according to the import of its words. The issuance of protective orders is within the discretion of the trial court, to be granted

---

[2]In some areas of litigation, public policy favors public disclosure of information derived in the discovery process. Congress has expressly provided that in the taking of depositions for use in "any suit in equity brought by the United States under sections 1–7 of this title, . . . the proceedings shall be open to the public as freely as are trials in open court; and no order excluding the public from attendance on any such proceedings shall be valid or enforceable." 15 U.S.C. § 30 (1958). The Ninth Circuit has found this policy applicable to other forms of discovery and in private antitrust suits as well, because "[p]rivate treble–damage actions are an important component of the public interest in 'vigilant enforcement of the antitrust laws" (citing *Lawlor v. National Screen Serv. Corp.,* 349 U.S. 322, 329, 99 L. Ed. 1122, 75 S. Ct. 865 (1955)). *Olympic Ref. Co. v. Carter,* 332 F.2d 260, 264 (9th Cir. 1964).

However, it was held in *D'Ippolito v. American Oil Co.,* 272 F. Supp. 310 (S.D.N.Y. 1967) that this statute does not apply to actions commenced by private litigants. And in *United States v. IBM,* 87 F.R.D. 411 (S.D.N.Y. 1980), it was recognized that even where the government brings the action, the public may be excluded under appropriate circumstances and protective orders may be entered.

where, in its judgment, good cause exists, having in mind the purpose of the discovery rule to encourage full disclosure of all relevant facts so as to facilitate the administration of justice, acquaint the examiner with the testimony that will be given at trial, develop the truth, shorten and simplify the trial, eliminate elements of surprise, and permit the parties to prepare for trial.

Nowhere in the history of the rules or in the commentaries which we have read upon them can we find any indication that the purposes included that of disseminating to the general public the information derived from discovery, or any suggestion that such dissemination would serve the ends sought to be achieved by the rule. Chief Justice Burger, concurring in *Gannett Co. v. DePasquale,* 443 U.S. 368, 61 L. Ed. 2d 608, 99 S. Ct. 2898 (1979), made this significant observation:

> [D]uring the last 40 years in which the pretrial processes have been enormously expanded, it has never occurred to anyone, so far as I am aware, that a pretrial deposition or pretrial interrogatories *were other than wholly private to the litigants.* A pretrial deposition does not become part of a "trial" until and unless the contents of the deposition are offered in evidence. . . . In the entire pretrial period, there is no certainty that a trial will take place.

(Italics ours.) *Gannett,* at 396–97.

Nevertheless, within the last few years, there has appeared a line of cases which hold that a protective order forbidding publication of discovery material cannot be entered if the material is of sufficient newsworthiness, unless the court finds that (1) the harm posed by dissemination is substantial and serious, (2) the restraining order is narrowly drawn and precise, and (3) there is no alternative means of avoiding the harm which intrudes less directly on expression.

*In re Halkin,* 598 F.2d 176 (D.C. Cir. 1979) is the leading case espousing this doctrine. The defendant in *Halkin* was the United States government, sued by the plaintiffs for invasion of their constitutional rights through unlawful

surveillance, occasioned by their opposition to the war in Vietnam. There was no question but that the matters revealed were of public importance, as well as public interest. Here there is no indication that the Aquarian Foundation's activities enjoy a comparable distinction. Nor is the government a party. These facts are sufficient to distinguish *Halkin*. Moreover, we are not convinced that the *Halkin* approach properly serves the administration of justice. As the 2–judge majority did in *Halkin,* we look to the United States Supreme Court for guidance. We are led, however, to a different conclusion.

Why are protective orders needed? There has never been any question but that the individual's interest in commercially valuable information, such as "trade secrets", deserves protection. But the language of CR 26(c) makes it clear that interests other than financial warrant protection under the rule. Protective orders may be entered to prevent "annoyance, embarrassment, oppression, or undue burden or expense".

Implicit in this language is a recognition that by requiring a party to submit to the searching inquiries of discovery, the courts have required him to give information about himself which he would otherwise have no obligation to disclose. A realm of privacy which courts had previously left undisturbed was now opened. True, as to all information derived through these proceedings and admitted at trial, a party's interest in privacy must be sacrificed to the needs of adjudication. But as to other information which he is forced to give under the liberal rules of discovery, the effective administration of justice does not require dissemination beyond that which is needed for litigation of the case. It was the needs of litigation and only those needs for which the courts adopted this rule and demanded of the litigant a duty which would not otherwise be his. For this reason, it is proper that the courts be slow to subject a civil litigant to any exposure which he deems offensive, beyond that which serves the purpose of the rule.

Rights of privacy are established in tort law. *See*

Restatement (Second) of Torts §§ 652–652I (1977); *Mark v. Seattle Times*, 96 Wn.2d 473, 635 P.2d 1081 (1981). A tort action should not and does not constitute the sole protection which government affords to the privacy interest of individuals. A threatened invasion of those interests may not have all of the characteristics necessary to warrant recovery of damages under existent tort principles and yet be properly a subject of governmental sanction. Numerous statutes of this state provide examples of such intervention.

These include RCW 43.07.100 (information regarding personal affairs furnished to the Bureau of Statistics); RCW 26.26.050 (records of artificial insemination); RCW 71.05.390 (information regarding the mentally ill); RCW 7.68.140 (information regarding records of crime victims). Other statutes protecting confidentiality include RCW 10.29.030(3), RCW 15.65.510, RCW 18.20.120, RCW 18.46-.090, RCW 18.72.265, RCW 19.16.245, RCW 24.03.435, RCW 24.06.480, RCW 42.17.310 (the public disclosure initiative lists 11 categories of exempt records, including those containing personal information regarding students, patients, clients, prisoners, probationers, parolees, and information regarding employees, appointees or elected officials, "to the extent that disclosure would violate their right to privacy"), RCW 43.21F.060, RCW 43.22.290, RCW 43.43.856, RCW 43.105.041, RCW 48.13.220, RCW 49.17-.200, and RCW 78.52.260.

Federal statutes forbid disclosure except for limited purposes of census information (Census Act, 13 U.S.C. §§ 8, 9, 214 (1954)), data concerning personal lives and business affairs given for purposes of tax collection (Internal Revenue Code, 26 U.S.C. § 6103 (1964)), and disclosure by a federal officer of a wide range of confidential information concerning the operation of businesses (18 U.S.C. § 1905 (1948)).[3]

---

[3]*See* Bloustein, *Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser*, 39 N.Y.U. L. Rev. 962 (1964). Professor Bloustein, noting the "increasing accumulation of information about each of us which finds its way into government

The "prior restraint" involved in a protective order issued in discovery proceedings is no different in substance from that which is imposed by these statutes. Each protects the confidentiality of information extracted through governmental processes. It is obviously the legislative purpose in enacting these protective statutes, as it was of the Congress and the courts in adopting the discovery rules, to both protect the individual's right of privacy and secure his willing and honest response to the questions asked. In each instance, it is deemed necessary to give the protection in order to achieve the government's objective, whether that be the facilitation of the truth seeking objective in litigation, the imposing of an income tax, care and treatment of the mentally ill, the promulgation of regulations affecting an industry, or other legitimate governmental goal.

We think it safe to say that because of their encroachment upon First Amendment rights of speech and press, if provisions such as these cannot be sustained, the result surely will be a serious undermining of the morale of the people as well as the integrity of government. Provisions such as these, like CR 26(c), express strong governmental policy, designed to protect valuable rights of private individuals as well as to further legitimate interests of the state. The court's endeavor should be to uphold such measures if possible, if it can be done without unduly invading some

---

records and files", said:

> Most of us have agreed . . . that the social benefits to be gained in these instances require the information to be given and that the ends to be achieved are worth the price of diminished privacy.
>
> But this tacit agreement is founded upon an assumption that information given for one purpose will not be used for another. We are prepared to tell the tax collector and the census taker what they need to know, but we are not prepared to have them make a public disclosure of what they have learned. The intrusion is tolerable only if public disclosure of the fruits of the intrusion is forbidden. This explains why many of the statutes which require us to tell something about ourselves to a government agency contain an express provision against disclosure of such information. It also explains why there are general provisions prohibiting disclosure of information of a personal nature gained in an official capacity.

(Footnotes omitted.) Bloustein, *supra* at 999.

other protected right. A persuasive argument can be made that when persons are required to give information which they would otherwise be entitled to keep to themselves, in order to secure a government benefit or perform an obligation to that government, those receiving that information waive the right to use it for any purpose except those which are authorized by the agency of government which exacted the information.[4] However, because the United States Supreme Court has been reluctant to find waiver in First Amendment cases, we do not pursue that theory but confine ourselves to the question whether the "heavy burden" of justifying the restraint has been sustained in the circumstances of this case.

It is not alone in the area of tort law or statutory enactment that rights of privacy have been acknowledged. The United States Supreme Court both in majority and minority opinions has exhibited increasing awareness and appreciation of these important adjuncts to freedom.

Justice Brandeis, dissenting in *Olmstead v. United States,* 277 U.S. 438, 478, 72 L. Ed. 944, 48 S. Ct. 564, 66 A.L.R. 376 (1928), said:

---

[4]The Supreme Court has said that waivers of First Amendment rights are to be inferred only in "clear and compelling" circumstances. *Curtis Pub'g Co. v. Butts,* 388 U.S. 130, 145, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967). Also in *Perry v. Sindermann,* 408 U.S. 593, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972), the Court found that denial of tenure to a teacher had been caused by his advocacy of positions contrary to those of his employers and held that a benefit such as employment could not be conditioned on a waiver of constitutional rights.

We find it difficult to conceive of circumstances more "clear and compelling" than those involved here. Parties seeking to utilize the processes of discovery necessarily acquaint themselves with the rules which attend that process. They know the purposes for which discovery is intended, and that protective orders can be entered in the discretion of the court. Attorneys are surely aware that it is improper to exploit the fruits of discovery by using them for other than authorized purposes. It is true that no penalty can attach for such use if a protective order is not obtained; but it is understood in the majority of cases that confidentiality will be respected, thus removing the necessity of seeking such an order to protect against unwanted publicity.

In the case of governmental employees and officials, it is also presumably made clear to them upon assuming their duties that information obtained in the course of their duties from private persons is to be kept confidential.

The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. . . . They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.

In *Time, Inc. v. Hill,* 385 U.S. 374, 17 L. Ed. 2d 456, 87 S. Ct. 534 (1967), Justice Fortas (joined by the Chief Justice and Justice Clark), dissenting, said:

There are great and important values in our society, none of which is greater than those reflected in the First Amendment, but which are also fundamental and entitled to this Court's careful respect and protection. Among these is the right to privacy, which has been eloquently extolled by scholars and members of this Court. . . . It is, simply stated, the right to be let alone; to live one's life as one chooses, free from assault, intrusion or invasion except as they can be justified by the clear needs of community living under a government of law. As Mr. Justice Brandeis said in his famous dissent in *Olmstead* v. *United States,* 277 U. S. 438, 478 (1928), the right of privacy is "the most comprehensive of rights and the right most valued by civilized men."

. . .

. . . As stated in the concurring opinion of Mr. Justice Goldberg, with whom THE CHIEF JUSTICE and MR. JUSTICE BRENNAN joined: "the right of privacy is a fundamental personal right, emanating 'from the totality of the constitutional scheme under which we live.'" [*Griswold v. Connecticut,* 381 U.S. 479, 494 (1965)].

(Footnotes omitted.) *Time, Inc.,* at 412–14.

*Time, Inc.* was a case in which the plaintiffs sought damages for invasion of their privacy through publication of a story falsely declaring that they had been involved in an encounter with convicts similar to the one then being portrayed in a stage play in New York. The Court held that Time, Inc., could be held liable only if the story was printed recklessly or with knowledge of its falsity.

Since the decisions in that case and *Rosenbloom v.*

*Metromedia, Inc.,* 403 U.S. 29, 29 L. Ed. 2d 296, 91 S. Ct. 1811 (1971) (extending the rule of *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964) to matters of general or "public interest" as well as public officials and public figures), the high Court has begun to take a more sympathetic view of the rights of persons who are the victims of publicity. *See Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 53 L. Ed. 2d 965, 97 S. Ct. 2849 (1977) (a television station owner may not appropriate an individual's entertainment act); and *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974) (an attorney, even though he has gained a reputation in the community, is a private individual and does not have to meet the *New York Times* standards of proof in pursuing a libel action). In *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 488, 43 L. Ed. 2d 328, 95 S. Ct. 1029 (1975), the Court took note of the fact that there is, in this century, "a strong tide running in favor of the so–called right of privacy" and said that powerful arguments can be made that there is a zone of privacy surrounding every individual, a zone within which the state may protect him from intrusion by the press, with all its attendant publicity. There, a damage action was brought, relying upon a Georgia statute which made it a misdemeanor to broadcast a rape victim's name. The Court upheld the broadcasting company's right to announce the name in that case, because it appeared in the records of the court, which were open to the public. It said that the state may not impose sanctions on the publication of truthful information contained in official court records open to public inspection. However, the Court did not suggest that all judicial proceedings are necessarily public. On the contrary, it said:

> If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information. Their political institutions must weigh the interests in privacy with the interests of the public to

know and of the press to publish.
(Footnote omitted.) *Cox Broadcasting Corp.,* at 496.

In a footnote, the Court said that it was not implying anything about constitutional questions which might arise from a state policy not allowing access by the public and press to various kinds of official records, such as records of juvenile court proceedings.

These two statements taken together strongly suggest that the Court was aware of the overriding necessity for the protection of privacy interests in certain governmental contexts—such as those involved in discovery proceedings and the various situations covered by the statutes we have cited earlier.

The Supreme Court has recognized privacy claims in *Carey v. Population Servs. Int'l,* 431 U.S. 678, 52 L. Ed. 2d 675, 97 S. Ct. 2010 (1976); *Planned Parenthood v. Danforth,* 428 U.S. 52, 49 L. Ed. 2d 788, 96 S. Ct. 2831 (1976); and *Roe v. Wade,* 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973). And in *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 2 L. Ed. 2d 1488, 78 S. Ct. 1163 (1958), the Court gave strength to the individual's freedom of association, which is one of the attributes of the interest in privacy. There an attempt on the part of the State to require the NAACP to disclose its membership lists was rebuffed. The Court said: "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective . . . restraint on freedom of association". *NAACP,* at 462.

Thus we have seen that the courts, in promulgating the rules of discovery, were aware that by allowing liberal discovery, with inquiries into matters which would not necessarily be introduced or admissible at trial, they were permitting invasions of a litigant's private domain and were rightly concerned that he should be protected against abuse of the discovery process.

Protection against use of materials for publicity purposes has most frequently been achieved by limiting the parties

in attendance at a deposition and ordering the deposition sealed until further order of the court. 4 J. Moore, *Federal Practice* ¶ 26.74 (2d ed. 1982).

Cases involving a claim of constitutional right to publicize the results of discovery appear to be recent phenomena.

Among those courts which have been called upon to consider the proposition, we have been surprised to find some which have summarily held that the right to publish is paramount, without giving any attention to the needs of judicial administration, or the interests of litigants. These include *Georgia Gazette Pub'g Co. v. Ramsey,* 248 Ga. 528, 284 S.E.2d 386 (1981), reversing a thoughtful opinion of the superior court judge. That judge did not reject *In re Halkin,* 598 F.2d 176 (D.C. Cir. 1979), but found all of its requirements satisfied, essentially upon the basic principle that giving publicity to discovery materials does not serve the fair administration of justice. The judge pointed out that a protective order would help ensure a fair trial in the civil case and in any possible criminal proceedings which might be brought against the plaintiff.[5]

The Georgia Superior Court also took notice of the plaintiff's privacy interests and the exploitation which was within the power of the defendant as a publisher of newspapers.

Unfortunately, the Supreme Court of Georgia paid no heed to these considerations, but held without discussion that the provision of the state constitution guaranteeing freedom of the press was decisive of the issue. Inasmuch as the court ignored the objectives and needs of judicial administration, as served by the discovery rules or the interests of litigants, we do not find that opinion persuasive.

In contrast is the approach of Mr. Justice Rehnquist, concurring in *Smith v. Daily Mail Pub'g Co.,* 443 U.S. 97,

---

[5]This was an action for invasion of privacy based on a story about the plaintiff, a dentist, as a prime suspect in the investigation of a crime.

61 L. Ed. 2d 399, 99 S. Ct. 2667 (1979). He cited *American Communications Ass'n v. Douds,* 339 U.S. 382, 394, 94 L. Ed. 925, 70 S. Ct. 674 (1950), where the Court had said: "Freedom of speech . . . does not comprehend the right to speak on any subject at any time", and also quoted from *Branzburg v. Hayes,* 408 U.S. 665, 683, 33 L. Ed. 2d 626, 92 S. Ct. 2646 (1972), "the press is not free to publish with impunity everything and anything it desires to publish." Rehnquist said that conflicting interests must be weighed. He would make it clear that the protection of a juvenile's reputation is a state interest of the highest order, but agreed with the result reached in *Smith* because the statute did not achieve its objective.

In *New York Press v. McGraw–Hill,* 4 Media L. Rep. 1819 (N.Y. App. Div. 1978), the appellate division of the New York Supreme Court, in a business defamation action against a publisher, held that the absence of a showing that the defendant's use of material and information obtained during discovery would seriously harm the plaintiff, or to show that such material was confidential, justified the New York Supreme Court (trial court) in refusing to grant a requested protective order. That court was of the opinion that the news media, even when a party to the action, had a right to gather news at a discovery proceeding and publish it, and that the right should not be interfered with except under the most extreme circumstances. We do not share that view.

The Florida Circuit Court for the Seventeenth Judicial Circuit, Broward County, denied a motion to exclude the press and public from discovery proceedings in *Johnson v. Broward Cy.,* 7 Media L. Rep. 2125 (Fla. Cir. Ct. 1981). It appears from the opinion that under Florida law depositions are generally open to the public. That is not the case in this state.

*Reliance Ins. Co. v. Barron's,* 428 F. Supp. 200 (S.D.N.Y. 1977) was a damage action brought by an insurance company against a well known financial magazine and one of its contributors, a professor of accountancy. Before discovery

began, the plaintiff asked for what the district judge termed "the customary pre-trial stipulation and order of confidentiality, limiting pre-trial use of such material to matters pertaining to this action." *Barron's,* at 202. The plaintiff specifically asked that no other uses be made of nonpublic information obtained pursuant to the discovery proceedings. The defendants declined to so stipulate and the court refused to enter a protective order, finding first that the plaintiff had failed to show that it "[would] indeed be harmed by disclosure." *Barron's,* at 204, quoting from *Johnson Foils, Inc. v. Huyck Corp.,* 61 F.R.D. 405, 409 (N.D.N.Y. 1973). But the court said that it would be inclined to issue the order if the defendants were not members of the press. It held that to restrain them from publishing information gained through discovery proceedings would constitute a "prior restraint", and that to justify such an order the plaintiff was required to demonstrate that the material to be restrained was, indeed, confidential and that its publication would cause plaintiff to suffer serious and irreparable injury.

For this proposition, the court cited only *New York Times Co. v. United States,* 403 U.S. 713, 29 L. Ed. 2d 822, 91 S. Ct. 2140 (1971), and that not as direct authority but as a comparable case. However, *New York Times* had nothing to do with the discovery process. It was an injunction suit brought by the United States against a newspaper to restrain publication of materials concerning government policy, which were, of course, of great interest to the public.

The district court in *Barron's* assumed that members of the media, when in court, have rights superior to those of other parties. This, as we have observed, is not a valid assumption.

In *Koster v. Chase Manhattan Bank,* 8 Media L. Rep. 1155 (S.D.N.Y. 1982), the United States District Court for the Southern District of New York wrote a scholarly opinion reviewing the history and nature of the discovery process in the courts, their holdings with respect to the limited First Amendment interest that litigants have in dissemi-

nating information learned through discovery, and the conflicting views which courts have expressed as to the standards to be used in evaluating protective orders restricting dissemination. The court took cognizance of the fact that the nature of discovery makes it unfair to allow the recipient of discovery materials an unlimited right to disseminate those materials. It indicated approval of the views of Wilkey, J., dissenting in *In re Halkin, supra,* who said that a litigant accepts the materials produced through discovery subject to the possibility that the court may restrict their use.

The court in *Koster* also noted the developing controversy regarding the standard which should be used to test the validity of a protective order. But having made all of these observations it avoided adoption of any standard by holding that, under the most lenient, the defendants had not shown good cause to issue a protective order. This opinion illustrates the difficulties which the trial courts create for themselves when they attempt to enunciate restrictive criteria for the exercise of their discretion.

At least two federal courts have made that attempt, the District of Columbia Court of Appeals in *In re Halkin, supra,* and the First Circuit Court of Appeals in *In re San Juan Star Co.,* 662 F.2d 108 (1st Cir. 1981).

The 2–judge majority in *Halkin,* while not willing to go so far as to declare a protective order to be a "prior restraint" on freedom of expression, as that term is generally understood, found that it did involve "First Amendment interests". *Halkin,* at 191. In that case the subject matter of the discovery process constituted material of considerable legitimate interest to the public.

The protective order concerned certain documents relating to government surveillance of opponents of the war in Vietnam and other political activities. The documents had been purged of all sensitive matters before being handed over to the plaintiffs pursuant to discovery requests. No protective orders were sought until after the documents were in the hands of the plaintiffs and they proposed to

release some of the documents to the press. The government claimed that public disclosure of these documents would be "'prejudicial to the defendants' right to adjudication of the issues in this civil action in an uncolored and unbiased climate, including a fair trial.'" *Halkin,* at 181–82. The trial court issued the order, apparently considering it routine.

The Court of Appeals, noting that the case would be tried to the court rather than to a jury, found these allegations inadequate to support the order.

In *Halkin* there were no rights of privacy to be protected by the order. The Court of Appeals, not content to merely hold that the court had abused its discretion under the circumstances of the case, devised a set of standards which could hardly be more onerous, had the court found the "prior restraint" doctrine applicable.[6]

The parties objecting to a protective order in *San Juan Star* were not litigants but rather were members of the media who desired to obtain information from attorneys who were subject to such an order. The First Circuit Court of Appeals gave much more weight than did the *Halkin* court to the litigant's right to privacy and to the effect of publicity upon the proper functioning of the discovery process. Nevertheless, the court, rather than permit the lower courts to continue to function under the rule as it is pres-

---

[6]The court said:

"Initially, the trial court must determine whether a particular protective order in fact restrains expression and the nature of that restraint. First Amendment interests will vary according to the type of expression subject to the order. An order restraining publication of official court records open to the public, or an order restraining political speech, implicates different interests than an order restraining commercial information. The interests will also vary according to the timeliness of the expression. An order restraining highly newsworthy information raises a different issue than a temporary restraint of materials having 'constant but rarely topical interest.'

"The court must then evaluate such a restriction on three criteria: the harm posed by dissemination must be substantial and serious; the restraining order must be narrowly drawn and precise; and there must be no alternative means of protecting the public interest which intrudes less directly on expression." (Footnotes omitted.) *In re Halkin,* 598 F.2d 176, 191 (D.C. Cir. 1979).

ently worded, conceived a set of criteria for determining whether a protective order should issue. These criteria were somewhat less stringent than those adopted in *Halkin,* but would nevertheless impose an added burden upon the trial court in determining whether to issue the protective order. The court characterized its standard as one "of 'good cause' that incorporates a 'heightened sensitivity' to the First Amendment concerns at stake". *San Juan Star,* at 116.

In our view, the procedures adopted by these courts for the promulgation of protective orders and the criteria for review of those orders are unduly complex and onerous and tend to undermine the objectives of pretrial discovery, which is designed to expedite rather than to hinder the progress of litigation. We do not find them mandated in the decisions of the United States Supreme Court which bear upon this subject.

We observe that the Supreme Court, in cases where it has been called upon to examine the reach of First Amendment protections, has generally taken cognizance of the function which publicity serves in the particular circumstances. For example, in *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 75 L. Ed. 1357, 51 S. Ct. 625 (1931), cited in *Halkin,* a newspaper, which was found objectionable because of the scandalous charges which it contained within its covers, had been abated. The Court, reversing, stressed the fact that the published charges were made against public officials, that for 150 years there had been almost an entire absence of attempts to restrain publications relating to malfeasance of public officers, indicating a deep-seated conviction that such restraints would violate constitutional rights, and that the growing complexity of society and the prevalence of organized crime in large cities made a vigilant press all the more necessary.

In *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 29 L. Ed. 2d 1, 91 S. Ct. 1575 (1971), the Court reversed an injunction directed against the distribution of leaflets (evidently racist in their content).

These cases are concerned with rights of advocacy, and

the dissemination of ideas, which lie at the core of First Amendment protection. *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 56 L. Ed. 2d 1, 98 S. Ct. 1535 (1978). There is no advocacy or abstract discussion involved here—only the reporting of supposed facts elicited in discovery.

The rationale of *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 491–92, 43 L. Ed. 2d 328, 95 S. Ct. 1029 (1975) is significant here:

> [I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accurately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally. With respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice. See *Sheppard* v. *Maxwell,* 384 U. S. 333, 350 (1966).[7]

In answer to the respondent's contention that the efforts of the press had infringed his right to privacy by broad-

---

[7]*Cf. Gannett Co. v. DePasquale,* 443 U.S. 368, 61 L. Ed. 2d 608, 99 S. Ct. 2898 (1979) where it was held that the United States Constitution does not give the public an affirmative right of access to a pretrial hearing, if all the participants agree that it should be closed to protect the fair trial rights of the defendant. The Court said that publicity concerning pretrial suppression hearings poses special risks of unfairness because it may influence public opinion against a defendant and inform potential jurors of inculpatory information wholly inadmissible at the actual trial.

The Court also said that the adversary system of criminal justice is premised upon the proposition that the public interest is fully protected by the participants in the litigation. It said that at common law pretrial proceedings, because of the concern for a fair trial, were never characterized by the same degree of openness as were actual trials.

casting to the world the fact that his daughter was a rape victim, the Court said that the commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions thereof are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government.

In *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 65 L. Ed. 2d 973, 100 S. Ct. 2814 (1980), a case in which the Court upheld the right of the press to attend criminal trials, Justice Brennan pointed out principles which are relevant in weighing the interest of the media in access to governmental proceedings. He said:

> An assertion of the prerogative to gather information must . . . be assayed by considering the information sought and the opposing interests invaded.
>
> . . . [T]he case for a right of access has special force when drawn from an enduring and vital tradition of public entree to particular proceedings or information. Cf. *In re Winship,* 397 U. S. 358, 361–362 (1970). Such a tradition commands respect in part because the Constitution carries the gloss of history. More importantly, a tradition of accessibility implies the favorable judgment of experience. Second, the value of access must be measured in specifics. Analysis is not advanced by rhetorical statements that all information bears upon public issues; what is crucial in individual cases is whether access to a particular government process is *important in terms of that very process.*

(Footnote omitted. Italics ours.) *Richmond Newspapers,* at 588–89.

Thus, it is evident that the Court's concern for the protection of First Amendment rights, at least insofar as access to governmental processes is concerned, increases in proportion to the intensity of the legitimate interest which the public has in learning about those processes. The conduct of public officials and the proceedings at trial are of vital concern to the people, the one because of their interest in the public functions which these officials perform and in their integrity, ability and diligence, and the other addi-

tionally, because of their interest in seeing that constitutional rights are protected and justice done. The need for information upon these matters is engendered by the rights and responsibilities the citizen has in choosing those who will govern him and administer justice and in pursuing the changes in law which will correct the inadequacies which he may find in the functioning of his government.

A case which is of particular significance here is *Landmark Communications, Inc. v. Virginia, supra.* There, a statute made it a crime to divulge information regarding proceedings before a state judicial review commission. For printing in its newspaper an article accurately reporting on a pending inquiry by the commission and identifying the judge whose conduct was being investigated, the appellant publisher was convicted of violating the statute.

The Court held that the First Amendment does not permit the *criminal punishment of third persons who are strangers* to proceedings before such a commission, for publishing or divulging truthful information regarding confidential proceedings of the commission.

No reporter, employee, or representative of Landmark had been subpoenaed by or had appeared before the commission in connection with the proceedings described in the article.

In reaching its conclusion that the conviction violated the defendant's First Amendment rights, the Court took care to note that the case did not involve a constitutional challenge to the State's power to keep the commission's proceedings confidential or to punish participants.

The Court cited *Mills v. Alabama,* 384 U.S. 214, 16 L. Ed. 2d 484, 86 S. Ct. 1434 (1966) where it had said that, whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that amendment was to protect the free discussion of governmental affairs. The operations of courts and the judicial conduct of judges are matters of utmost public concern.

It quoted from *Sheppard v. Maxwell,* 384 U.S. 333, 350,

16 L. Ed. 2d 600, 86 S. Ct. 1507 (1966):

> A responsible press has always been regarded as the handmaiden of effective judicial administration . . . Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism.

It found that the operation of the judicial inquiry commission was a matter of public interest, necessarily engaging the attention of the news media. The article published provided accurate factual information about a legislatively authorized inquiry pending before the commission, and in so doing clearly served those interests in public scrutiny and discussion of governmental affairs which the First Amendment was adopted to protect.

Recognizing that the confidentiality of the proceedings served legitimate state interests, the Court nevertheless found those interests insufficient to justify criminal sanctions for publication, *when imposed upon nonparticipants.* It noted that a number of states punished breaches of confidentiality by participants through contempt proceedings, and that more than 40 states having similar provisions did not find it necessary to provide criminal sanctions.

It observed that protection of the reputation of judges and the judicial system was not a sufficient ground for the sanction—judges and the court system are no more immune from scrutiny and criticism than other public officials.

Finally, the Court in *Landmark Communications, Inc. v. Virginia, supra* at page 845, said that much of the danger to the administration of justice posed by publicity could be eliminated through "careful internal procedures to protect the confidentiality of Commission proceedings."

We find implicit in this opinion a recognition that there are governmental proceedings which legitimately may be closed to the public and the press, and the State may punish those participating in such proceedings if they disobey

an order to keep them confidential. *See also Gulf Oil Co. v. Bernard,* 452 U.S. 89, 104 n.21, 68 L. Ed. 2d 693, 101 S. Ct. 2193 (1981), where the Court said:

> In the conduct of a case, a court often finds it necessary to restrict the free expression of participants, including counsel, witnesses, and jurors. Our decision regarding the need for careful analysis of the particular circumstances is limited to the situation before us— involving a broad restraint on communication with class members [in a Civil Rights Act class action, 42 U.S.C. §§ 2000 *et seq.*]. We also note that the rules of ethics properly impose restraints on some forms of expression. See, *e. g.,* ABA Code of Professional Responsibility, DR 7–104 (1980).

We have seen that in *Gannett v. DePasquale,* 443 U.S. 368, 61 L. Ed. 2d 608, 99 S. Ct. 2898 (1979), it was held that, in order to protect the right of a defendant to a fair trial, the court may close a preliminary hearing to the public and the press. We find implicit in that holding a recognition that when a hearing is closed, the court may properly restrict the use which participants in the hearing may make of information gained in that proceeding, forbidding its disclosure to members of the public, including the media. That being the case, there is no sound reason why the same restrictions may not be imposed in discovery proceedings.

To begin with, the public generally does not have the same interest in the conduct of civil actions that it has in criminal actions, for the public is a party to a criminal action, the plaintiff being the state or other governmental body. Also, the functioning of the adversary system plays an important role in avoiding abuses in civil proceedings. With respect to discovery proceedings, the strong governmental interest in effectuating the purposes of those proceedings makes it imperative that their integrity be preserved. Essential to that integrity is the protection of the party against whom discovery is sought from unnecessary "annoyance, embarrassment, oppression, or undue burden or expense". CR 26(c). Such protection must include protection of a party's privacy interest in avoiding

unwanted publicity. This objective serves not only the State's interest in protecting its citizens in their legitimate expectations of privacy, but also, and perhaps more importantly, the State's vital interest in seeing that justice is administered upon all of the relevant facts, freely and truthfully disclosed by the parties.

Inherent in CR 26(c), providing for protective orders, is a recognition that parties generally are not eager to divulge information about their private affairs and, that when called upon to do so in a lawsuit, will be even more reluctant if they are not assured that the information which they give will be used only for the legitimate purposes of litigation. Many will be tempted to withhold information and even to shade the truth, where otherwise they would not do so. And, as the trial court rightly observed, rather than expose themselves to unwanted publicity, individuals may well forgo the pursuit of their just claims. The judicial system will thus have made the utilization of its remedies so onerous that the people will be reluctant or unwilling to use it, resulting in frustration of a right as valuable as that of speech itself.

It is perhaps a matter of speculation as to what the effect will be in any given case. However, that which concerns us is the cloud which will be cast upon the integrity of the discovery process if the courts permit such intrusions.

As compared with the interests served by the rule, the interest of the public in knowing what information is given in such proceedings is, in the ordinary case, minimal. Of course, there are cases which involve matters which do concern the public generally (antitrust litigation being an example), and where privacy interests are not involved, there may be good reason to deny a protective order. In such cases, the tendency to undermine confidence in the integrity of the process may be negligible, and the objecting party may have difficulty in showing good cause, as was the case in *In re Halkin*, 598 F.2d 176 (D.C. Cir. 1979).

It does not seem likely that, where a matter is considered newsworthy, the media will be without its own means of

investigating the facts. In the present case, it is evident from the record that the defendants had obtained access to a sufficient amount of information about the plaintiff and his organization to produce a vivid series of accounts about their activities.

We are not told what interest of the public is served by the newspaper's further exposure of this allegedly religious sect,[8] unorthodox though it undoubtedly is, but we assume that publishers could rightly find it newsworthy. It may have some significance with respect to governmental activity, but, if so, that fact has not been brought to light. If the plaintiff and his associates are engaged in unlawful activities, it is safe to assume what with the exposure that has already been made, the appropriate law enforcement agencies will take action. In view of the fact that the discovery rules have a long history of functioning without exposure of litigants to unwanted publicity and at the same time the news media has flourished, giving extensive coverage to the bizarre and the unorthodox, we do not perceive that continued protection of the discovery proceedings will constitute a substantial impediment to news gathering in this area.

As the Supreme Court has more than once remarked, the function of the media in serving not only the public's need to know but the integrity of governmental functions themselves is of great importance in balancing First Amendment rights against other interests of the state. Here, there is nothing to indicate that publicity given to the evidence furnished by a party in a pretrial proceeding will in any way tend to promote the proper functioning of such proceedings. There is involved here no evaluation or criticism of judges or other officials administering the system nor of the system itself, but only a proposal to exploit the fruits of

---

[8]"A religious claim, to merit protection under the free exercise clause of the First Amendment, must satisfy two basic criteria. First, the claimant's proffered belief must be sincerely held; . . . [and] the claim must be rooted in religious belief, not in 'purely secular' philosophical concerns." (Footnote omitted.) *See Callahan v. Woods,* 658 F.2d 679, 683 (9th Cir. 1981).

that system. Thus, this vital consideration which has sometimes led the courts to favor the interests of speech and press over the rights of a defendant in a criminal trial are entirely absent.

Assuming then that a protective order may fall, ostensibly, at least, within the definition of a "prior restraint of free expression", we are convinced that the interest of the judiciary in the integrity of its discovery processes is sufficient to meet the "heavy burden" of justification. The need to preserve that integrity is adequate to sustain a rule like CR 26(c) which authorizes a trial court to protect the confidentiality of information given for purposes of litigation.

The rule itself imposes no affirmative obligation upon a participant to refrain from giving publicity to information derived in a discovery proceeding. However, as Chief Justice Burger has remarked, it has customarily been taken for granted that such information is given solely for purposes of litigation. It is evident that the rule contemplates that participants will not abuse the process, but if they do attempt or propose to do so, the party against whom such action is directed may apply for protection. Our understanding of the rule, contrary to that of the federal circuit courts in *In re Halkin, supra,* and *In re San Juan Star Co.,* 662 F.2d 108 (1st Cir. 1981), is that "good cause" is established if the moving party shows that any of the harms spoken of in the rule is threatened and can be avoided without impeding the discovery process. In determining whether a protective order is needed and appropriate, the court properly weighs the respective interests of the parties. The judge's major concern should be the facilitation of the discovery process and the protection of the integrity of that process, which necessarily involves consideration of the privacy interest of the parties and, in the ordinary case at least, does not require or condone publicity.

Here, there is no question but that the defendants were threatening to publicize the information which they gained through the discovery process. They insist upon their right to do so. The information to be discovered concerned the

financial affairs of the plaintiff Rhinehart and his organization, in which he and his associates had a recognizable privacy interest; and the giving of publicity to these matters would allegedly and understandably result in annoyance, embarrassment and even oppression.

Of course, by undertaking the lawsuit the plaintiff necessarily consented to the exposure of all relevant evidence admissible and admitted at trial, which will then be a matter of public record and available for publication by the defendants or any other person. But until and unless the fruits of the discovery are made public through the judicial process (or by the plaintiffs or others independently of discovery),[9] plaintiffs are entitled to the protection of the court.

We find no abuse of discretion and affirm the issuance of the protective order.

█ Turning to the plaintiffs' cross appeal, the major contention is that requiring disclosure of membership lists, donors and benefactors violates the rights of privacy and the associational rights of these persons. As should be clear from our previous discussion, certain invasions of those rights are necessary to enable the courts to render a just decision upon the relevant facts. The protective order shields the plaintiffs from abuse of the discovery privilege. The more extensive protection which they desire is within the discretion of the trial court in a proper case; but the plaintiffs are not entitled to such an order as a matter of right. There is no showing that the protective order is inadequate to prevent any abuse threatened by the defendants.

The plaintiffs, as the defendants point out, are attempting to assert a privilege to withhold evidence in a private

---

[9]The defendants express some concern that the protective order is too broad in that it does not make it clear that the defendants may publish the information if it is revealed in open court or otherwise made public by the plaintiffs. This may be an unnecessarily strict construction of the order; but to remove any doubt, the defendants should apply to the court to clarify the order, consistent with this opinion.

suit where they seek damages based upon the allegedly privileged information. We have reviewed the cases cited in their brief and find none which supports the theory in the circumstances of this case. All of the evidence covered by the order compelling disclosure was relevant to the plaintiffs' claims and the defense of those claims, and their legitimate interests in privacy and association were protected by the court's order insofar as was possible without denying the defendants the right to develop their defenses.

With respect to this order, also, we find no abuse of discretion.

The orders are affirmed.

BRACHTENBACH, C.J., and STAFFORD, WILLIAMS, and DORE, JJ., concur.

DOLLIVER, J. (concurring)—Although I agree with the result reached by the majority, I believe the court should state categorically that discovery under the standards of CR 26(c) and the protective orders of the court in this case do not require a First Amendment analysis. The United States Supreme Court has wisely avoided the morass of rather tendentious First Amendment commentary which has afflicted some of the federal courts in recent cases. *E.g., In re Halkin,* 598 F.2d 176 (D.C. Cir. 1979). We should do the same. I agree with the comment of the majority that "we are not convinced that the *Halkin* approach properly serves the administration of justice." Majority opinion, at 236. To this I would add it also does little to advance the cause of First Amendment protections. *See International Prods. Corp. v. Koons,* 325 F.2d 403 (2d Cir. 1963).

In his dissent to *In re Halkin,* Judge Wilkey states with great clarity why a protective order such as in this case is not an assault on the Bill of Rights:

Within the framework of the discovery laws, then, it is clear that whatever rights a party may have in the materials that it has exacted from another party in discovery

are qualified by conditions properly imposed by the court in its discretion under Rule 26(c). There is no "waiver" of First Amendment rights, as the majority tries to term it; it is simply that when a party uses the court's process in a manner which may be unfair to the other party and is unrelated to the litigation purpose of discovery, the court has the power and responsibility to take whatever action is necessary to protect its process from abuse, and a protective order requiring a litigant to use the products of discovery in a manner consistent with the purposes of discovery is a permissible "prior restraint" if it meets the standards set forth in Rule 26(c).

The majority argues that revelation of governmental action which sometimes accompanies civil litigation should not be kept from the public. Of course, this material on which petitioners wish to hold a press conference now *will* be made public—at the trial. Even matter which has been discovered, but which may not be deemed relevant to issues at trial, can later be fully disclosed and discussed, as I understand the purpose and tenor of the trial court's order. No suppression of free speech is involved in this case; what is at issue is the orderly control of the judicial process by the trial judge.

This is illustrated by the striking anomaly in the majority opinion's logic which the majority does not adequately explain. It is conceded "that plaintiffs do not have a First Amendment right of access to information not generally available to members of the public. *Pell v. Procunier,* 417 U.S. 817, 834, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Zemel v. Rusk,* 381 U.S. 1, 16–17, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *see also Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 609–10, 98 S.Ct. 1306 [1318], 55 L.Ed.2d 570 (1978)." Federal Rule of Civil Procedure 26(c)(1) allows the district court to prevent discovery altogether, if good cause is shown ("may . . . order . . . that the discovery not be had"). No one argues that such prohibition raises any First Amendment issues or problems, and apparently it is conceded by all that such an order may be based on mere "good cause," and the district court need not meet any more stringent test such as "reasonable likelihood of harm" or "serious and imminent threat," etc., before it can issue such

an order. However, the majority holds that when a *less serious* intrusion of the district court is made, *i. e.,* it attempts to set limits on the use of the information already received, it must meet *more stringent* First Amendment standards.

Thus the anomalous situation results, in which the district court is completely unfettered by First Amendment considerations when it is most intrusive, *i. e.,* prohibits discovery altogether, and is more restricted when it is less intrusive, *i. e.,* puts limits on the use of material which it allows to be discovered. This has nothing to do with any "benefits–privileges" analysis, as the majority interprets my position (note 28). It is simply the principle that the greater (the power to prohibit altogether) includes the lesser (the power to grant with conditions), a bit of logic which has been recognized as valid at least since the ancient Greeks.

It seems to me, then, that the majority's elaborate First Amendment analysis is gratuitous. Since an order properly issued under Rule 26(c) is constitutional, the focus of inquiry should be whether or not "good cause" has been shown for the order under review within the meaning of Rule 26(c). If the district court properly issued the order under Rule 26(c), then the order is consistent with First Amendment safeguards, and there is no reason to embark on an independent First Amendment analysis. If the district court did not properly issue the order under Rule 26(c), then it is violative of statutory standards, and there is again no reason to embark on a First Amendment analysis.

(Footnotes omitted.) *In re Halkin,* 598 F.2d at 208–09.

I concur with the view of Judge Wilkey. Subjecting the discovery process to the strictures of the First Amendment may increase trial courts' reluctance to allow discovery in the first place. Trial judges who fear the impairment of their ability to regulate abuses once the discovery process has started may resort to the more easily justified but more drastic alternative of denying discovery altogether. The analysis represented by the *In re Halkin* majority and by the dissent here neither advances the administration of

justice nor guarantees any rights contained in the First Amendment.

BRACHTENBACH, C.J., and DIMMICK, J., concur with DOLLIVER, J.

UTTER, J. (dissenting)—I must dissent because I cannot agree with the majority's analysis. While purporting to apply the doctrine of prior restraint to this case, the majority's ruling for all practical purposes makes discovery a category exempt from First Amendment scrutiny. I would vacate the existing protective order and remand for reconsideration in light of the guidelines set forth in this opinion. First Amendment interests must be balanced against legitimate concerns for the administration of the discovery process, with the ultimate burden of justification resting with the party seeking the restraint.

The majority opinion expresses doubt as to the applicability of the prior restraint doctrine with respect to discovery protective orders, majority at 231, but nevertheless finds CR 26(c) justified even under the "heavy burden", majority at 239, imposed under the prior restraint doctrine. While voicing adherence to the prior restraint doctrine, the majority's analysis reflects more its initial skepticism as to the doctrine's application. That skepticism is warranted but that does not mean First Amendment interests need not be carefully balanced in issuing protective orders. By failing to apply in earnest the traditionally stringent standards of prior restraint, the majority both dilutes the future value of the doctrine in a proper context and neglects the primary duty of the court in this case: establishing the appropriate standard by which trial courts may issue protective orders without violating the requirements of the constitution.

I

The thrust of the majority's analysis is that the court need not reach the question of whether the prior restraint

doctrine applies to protective orders because even under the heavy burden of that doctrine, "the interest of the judiciary in the integrity of its discovery processes is sufficient to meet the 'heavy burden' of justification." Majority at 256. Since, under the majority's analysis, CR 26(c) is justified even under the stringent prior restraint test, protective orders may be justified on a showing of good cause which the majority defines as a showing of any enumerated harm threatened that "can be avoided without impeding the discovery process." Majority at 256. While I agree with the majority that the interests it identifies are important factors to weigh in determining whether a protective order should issue, such interests do not exempt from First Amendment analysis the many situations that arise under the rule. While purporting to hold CR 26(c) is a justified prior restraint, the majority's position is actually tantamount to holding discovery is an excepted category from First Amendment scrutiny—a position unsupported in the law. *Rodgers v. United States Steel Corp.*, 508 F.2d 152, 163 (3d Cir.), *cert. denied*, 420 U.S. 969 (1975); *In re Halkin*, 598 F.2d 176, 186–87 (D.C. Cir. 1979).

Prior restraints are permitted only in the most exceptional cases. *United States v. Progressive, Inc.*, 467 F. Supp. 990, *reconsideration denied*, 486 F. Supp. 5 (W.D. Wis.), *appeal dismissed*, 610 F.2d 819 (7th Cir. 1979). "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559, 49 L. Ed. 2d 683, 96 S. Ct. 2791 (1976). The Supreme Court has described the doctrine as "one of the most extraordinary remedies known to our jurisprudence." *Nebraska Press Ass'n v. Stuart, supra* at 562. There is a heavy presumption against the constitutionality of prior restraints. To be lawful, the restraint "must fit within one of the narrowly defined exceptions to the prohibition against prior restraints . . ." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559, 43 L. Ed. 2d 448, 95 S. Ct. 1239 (1975).

[The] publication [sought to be restrained] must inevitably, directly, and immediately cause the occurrence of an event kindred to imperiling the safety of a transport already at sea . . .

*New York Times Co. v. United States,* 403 U.S. 713, 726–27, 29 L. Ed. 2d 822, 91 S. Ct. 2140 (1971) (Brennan, J., concurring). Even when the prior restraint is imposed to protect a "vital constitutional guarantee . . . the barriers to prior restraint remain high and the presumption against its use continues intact." *Nebraska Press Ass'n v. Stuart, supra* at 570. *See Organization for a Better Austin v. Keefe,* 402 U.S. 415, 418–20, 29 L. Ed. 2d 1, 91 S. Ct. 1575 (1971); *Carroll v. President & Comm'rs,* 393 U.S. 175, 21 L. Ed. 2d 325, 89 S. Ct. 347 (1968); *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 9 L. Ed. 2d 584, 83 S. Ct. 631 (1963); *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 75 L. Ed. 1357, 51 S. Ct. 625 (1931); *Seattle v. Bittner,* 81 Wn.2d 747, 505 P.2d 126 (1973); *Adams v. Hinkle,* 51 Wn.2d 763, 322 P.2d 844 (1958).

Yet faced with this almost insurmountable hurdle, the majority holds protective orders and the multitude of situations under which they might arise are justified as long as a threatened harm can be shown and the protective order will not impede discovery. Had the majority actually applied the traditional doctrine of prior restraint, neither CR 26(c) nor the protective order in this case would have withstood the constitutional test. Even constitutional concerns for privacy do not rise to the level of overcoming the presumption of unconstitutionality attached to prior restraints. *Organization for a Better Austin v. Keefe, supra* at 418–20.

## II

The protective order's invalidity under the traditional prior restraint test should not resolve this case. While some First Amendment interest does attach to the dissemination of discovery materials, I feel in this context the heavy burden of the prior restraint doctrine is inappropriate. *But see*

*Reliance Ins. Co. v. Barron's,* 428 F. Supp. 200 (S.D.N.Y. 1977); *Davis v. Romney,* 55 F.R.D. 337 (E.D. Pa. 1972).

As a general proposition, pretrial discovery is public unless compelling reasons exist for denying the public access to the proceedings. *American Tel. & Tel. Co. v. Grady,* 594 F.2d 594 (7th Cir. 1979); *United States v. IBM Corp.,* 66 F.R.D. 219 (S.D.N.Y. 1974); *Johnson Foils, Inc. v. Huyck Corp.,* 61 F.R.D. 405 (N.D.N.Y. 1973). An individual is entitled to use the fruits of discovery for lawful purposes unless a protective order issues. *Leonia Amusement Corp. v. Loew's, Inc.,* 18 F.R.D. 503, 508 (S.D.N.Y. 1955). While courts have diverged as to the appropriate constitutional standard, there has been little dispute as to the existence of a First Amendment interest in discovery materials. *In re San Juan Star Co.,* 662 F.2d 108 (1st Cir. 1981); *National Polymer Prods., Inc. v. Borg–Warner Corp.,* 641 F.2d 418 (6th Cir. 1981); *In re Halkin, supra* (majority and dissent concurring on this point); *Koster v. Chase Manhattan Bank,* 8 Media L. Rep. 1155 (S.D.N.Y. 1982); Note, *Protective Orders Prohibiting Dissemination of Discovery Information: The First Amendment and Good Cause,* 1980 Duke L.J. 766 (hereinafter Duke Note); Note, *Rule 26(c) Protective Orders and the First Amendment,* 80 Colum. L. Rev. 1645 (1980) (hereinafter Columbia Note). *But cf. Rodgers v. United States Steel Corp.,* 536 F.2d 1001, 1006 (3d Cir. 1976) (considering such First Amendment interest waived); *International Prods. Corp. v. Koons,* 325 F.2d 403, 407 (2d Cir. 1963) (court entertained no doubt of constitutionality of protective orders, though it did not deny the existence of First Amendment interests).

Nonetheless, I feel there are factors that distinguish the restraint of a protective order from the prior restraints that have traditionally been accorded such a heavy presumption of invalidity. A protective order is a restraint on expression but "[t]he phrase 'prior restraint' is not a self–wielding sword. Nor can it serve as a talismanic test." *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 441, 1 L. Ed. 2d 1469, 77 S. Ct. 1325 (1957) (Frankfurter, J.). *See generally* Bar-

nett, *The Puzzle of Prior Restraint,* 29 Stan. L. Rev. 539 (1977). Protective orders are unlike classic prior restraints (*e.g.,* administrative licensing schemes) in that they result from an adversary process and can be limited to specific expression. *In re Halkin,* 598 F.2d at 185 nn.16–17. More importantly, protective orders relate only to material gathered by virtue of the court's processes. As the court in *Koster v. Chase Manhattan Bank,* 8 Media L. Rep. 1155, 1159 (S.D.N.Y. 1982) stated: "[T]he special nature of discovery as a source of information justifies a reduced level of scrutiny." As Judge Wilkey in his dissent to *Halkin* stated, one's interest in disseminating discovery materials is restricted because it is obtained solely by virtue of the court's processes. 598 F.2d at 206. Judge Wilkey concluded that since a court can deny access to discovery altogether without being subject to First Amendment analysis, it is anomalous to make protective orders subject to such First Amendment strictures. Applying the logical construct that the greater includes the lesser, Judge Wilkey concluded the greater power of denying access includes the lesser power of placing restrictions on access, and that both should be subject to the same standard.[10] The notion is plausible, but unfortunately deductive logic is a helpful but not necessarily dispositive aspect of legal analysis. *See* R. Wasserstrom, *The Judicial Decision,* ch. 2 (1961). The greater does not always include the lesser when it is a constitution and not a syllogism we are expounding. While an individual does not have a right to public employment, the government may not place unconstitutional conditions on such employment:

> [the government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations,

---

[10]The majority, too, seems persuaded by the same argument. See its discussion of *Gannett Co. v. DePasquale,* 443 U.S. 368, 61 L. Ed. 2d 608, 99 S. Ct. 2898 (1979) at page 253. For the same reasons discussed in text, I find its analysis unpersuasive.

his exercise of those freedoms would in effect be penalized and inhibited.

*Perry v. Sindermann,* 408 U.S. 593, 597, 33 L. Ed. 2d 570, 92 S. Ct. 2694 (1972). *See In re San Juan Star Co., supra* at 114; Duke Note at 789–90; Columbia Note at 1647 n.16. Thus, if the court's reason for denying a party access to discovery was to deny the party a First Amendment interest in dissemination of those materials, such denial would be just as invalid as a protective order motivated by similar concerns. Judge Wilkey's affirmation of the highly discretionary good cause standard as a basis for denial of both access and protective orders, while logically plausible, does not follow inevitably from a constitutional analysis.[11]

First Amendment concerns persist even though protective orders should not be subject to a heavy presumption of unconstitutionality. In so concluding, I fall in line with the majority of courts that have considered the question. *See Koster,* at 1158–59 (and cases cited therein).[12] Unfortunately, the majority's characterization of the good cause standard for such orders does not reflect a concern for the First Amendment interests that must be weighed. By requiring only a showing of one of CR 26(c)'s enumerated

---

[11]The majority also seems enamored of the idea of waiver in this context, though it is chary of adopting such an approach. See footnote 4. Access to discovery cannot be conditioned on a waiver of constitutional rights, *In re Halkin,* 598 F.2d 176, 190 (D.C. Cir. 1978), nor generally is waiver of constitutional rights implied. *In re Halkin, supra; Brady v. United States,* 397 U.S. 742, 25 L. Ed. 2d 747, 90 S. Ct. 1463 (1970); *Curtis Pub'g Co. v. Butts,* 388 U.S. 130, 142–45, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967). *But see Rodgers v. United States Steel Corp.,* 536 F.2d 1001 (3d Cir. 1976).

[12]The Supreme Court has not addressed this question directly, but its recent decision in *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 68 L. Ed. 2d 693, 101 S. Ct. 2193 (1981) provides a helpful analogy. There the Court struck down a restraining order under Fed. R. Civ. P. 23 as an abuse of discretion, but commented:

> Although we do not decide what standards are mandated by the First Amendment in this kind of case, we do observe that the order involved serious restraints on expression. This fact, at minimum, counsels caution on the part of a district court in drafting such an order, and attention to whether the restraint is justified by a likelihood of serious abuses.

452 U.S. at 103–04. See Section III(C) in the text of the opinion.

harms and that the discovery process not be impeded, the majority does not even require a trial court to look to the countervailing interests of the party against whom the protective order is sought.

### III

Recently, courts have struggled with devising standards by which trial courts should render protective orders when First Amendment interests are at issue. The cases of *Halkin* and *San Juan Star* are notable. While these courts have not evaluated protective orders "by the stringent standards governing classic prior restraints", *Koster,* 8 Media L. Rep. at 1159, they have required more rigorous standards for reviewing "good cause" determinations than "abuse of discretion".[13]

### A

In *Halkin,* the court required "close scrutiny of [the impact of protective orders] on protected First Amendment expression", 598 F.2d at 186, viewing a protective order as a "direct governmental action limiting speech". *Halkin,* at 183. The court set forth a 2–part test of first determining the significance of the First Amendment interests restrained, and second, evaluating the restraint according to three criteria:

> the harm posed by dissemination must be substantial and serious; the restraining order must be narrowly drawn and precise; and there must be no alternative means of protecting the public interest which intrudes less directly on expression.

(Footnotes omitted.) *Halkin,* at 191. This approach requires the balancing of First Amendment interests against the harm avoided by the protective order, and imposes requirements of specificity, narrowness and an

---

[13]The inconsistency of the majority's approach is made evident by its treatment of *Halkin* and *San Juan Star.* The majority states the standards articulated by those courts are not mandated by the constitution. Majority at 248. Yet the standards developed in both cases are less stringent than the heavy presumption against validity, which the majority purports to apply in dispensing with this case.

exhaustion of less intrusive alternatives.

I agree with the *Halkin* court that a trial court's ability to deny access does not dispose of the First Amendment concerns as to protective orders, but I do not feel the First Amendment analysis is the same regardless of the mode by which information is acquired. *See Halkin,* at 187–88, citing *First Nat'l Bank v. Bellotti,* 435 U.S. 765, 778, 783, 55 L. Ed. 2d 707, 98 S. Ct. 1407 (1978). The court has legitimate concerns in administering the discovery process, which may affect the extent to which First Amendment expression remains unimpaired. The same evil does not result "from attaching certain conditions to government–connected activity as from imposing such conditions on persons not connected with government." Van Alstyne, *The Demise of the Right–Privilege Distinction in Constitutional Law,* 81 Harv. L. Rev. 1439, 1448 (1968).

While the *Halkin* court does not focus on these legitimate concerns, the standards it articulates provide trial courts with the flexibility needed to address such concerns. *See Brink v. DaLesio,* 82 F.R.D. 664, 678 (D. Md. 1979) ("At most, the [*Halkin*] opinion will perhaps prompt a more reasoned and precise statement by judges in issuing Rule 26(c) orders.").

## B

The court in *San Juan Star* established a standard somewhat less restrictive than the *Halkin* majority; a standard of good cause that "incorporates a 'heightened sensitivity' to the First Amendment concerns at stake", 662 F.2d at 116. Judge Coffin articulated this heightened sensitivity thus: "We look to the magnitude and imminence of the threatened harm, the effectiveness of the protective order in preventing the harm, the availability of less restrictive means of doing so, and the narrowness of the order if it is deemed necessary." *San Juan Star,* at 116. With respect to the "threatened harm", Judge Coffin felt it should be evaluated on a "sliding scale . . . as the potential harm grows more grave, the imminence necessary is

reduced." *San Juan Star,* at 116. More explicitly than did the court in *Halkin,* the court in *San Juan Star* recognized the legitimate concerns a court has in administering the discovery process which might justify subordination of First Amendment interests that could not otherwise be limited. Concerns for the administration of the discovery process and for minimizing injury to parties are legitimate bases for restricting First Amendment interests in the discovery context.

## C

While the United States Supreme Court has not addressed First Amendment concerns in discovery, I believe First Amendment interests must be weighed much as the Court required in *Pickering v. Board of Educ.,* 391 U.S. 563, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968). In *Pickering,* the Court dealt with the question of a teacher's First Amendment rights within the context of his employment. While the Court rejected unequivocally the Illinois Supreme Court's assertion that an individual may be forced to give up constitutional rights as a condition of public employment, the Court conceded:

> At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

391 U.S. at 568. Because of the multitude of situations that might arise, the *Pickering* Court did not presume to set forth any general standard for balancing the respective interests. Nor would I presume to do so in this case. Nonetheless, the *Pickering* Court did require that the school's legitimate interests *actually* be served by a limitation on speech, and in a subsequent case dealing with the same

concerns, the Court required a material and substantial interference with a school's interests in order and discipline to justify curtailment of First Amendment liberties. *Tinker v. Des Moines Indep. Comm'ty Sch. Dist.*, 393 U.S. 503, 508–09, 21 L. Ed. 2d 731, 89 S. Ct. 733 (1969). I believe both *Halkin* and *San Juan Star* provide helpful guidelines to a trial court in striking the right balance. *See* Duke Note, *supra* at 793–99. Below, I outline some of the questions a trial court should ask in determining if a protective order should issue:

1. What is the extent of the First Amendment interest enjoined by the protective order?

As the *Halkin* court indicated, "First Amendment interests will vary according to the type of expression subject to the order." 598 F.2d at 191. The majority distinguishes *Halkin* and *San Juan Star* as cases involving intense public concern while the matters before us are of less public consequence. Even assuming the validity of the majority's assertion, it has not provided an analytical framework by which we as a reviewing court will be able to differentiate this case from one in which the First Amendment interest is more substantial.

2. What is the harm threatened by failure to issue a protective order?

As the *Halkin* court indicated, "widely varying interests" may be advanced in support of a protective order. The rule itself allows for such breadth of interest: "the court . . . may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . ." CR 26(c). As Judge Coffin indicated, the degree of imminence of any harm will vary in inverse proportion to the magnitude of the harm. An additional concern here is the question of how central the information is to the case. If the information is of central relevance, a party's interest and expectation in privacy might be diminished. At the same time, the centrality of the information may affect a party's right to a fair trial.

3. What is the status of the parties seeking a protective

order and against whom the protective order is sought?

The expectation in privacy will vary if the party seeking the order is a public body or a private person, or if the individual is a nonparty or central litigant. If a protective order is sought against a suing party, it might impede the party's First Amendment right to freely litigate, especially if such action is brought for a public purpose (*e.g.*, civil rights, antitrust actions). *See Halkin*, 598 F.2d at 187; *In re Primus*, 436 U.S. 412, 56 L. Ed. 2d 417, 98 S. Ct. 1893 (1978). If, on the other hand, the defendant is the party against whom the protective order is sought, the First Amendment right to litigate seems less in jeopardy. In addition, the court must be sensitive to concerns militating in favor of a protective order, namely a party's First Amendment interest "to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714, 51 L. Ed. 2d 752, 97 S. Ct. 1428 (1977). As one commentator has indicated, "In the absence of sufficient justification, a court's *denial* of a motion for a protective order may itself be an unconstitutional infringement of the producing party's first amendment rights." (Italics mine.) Duke Note, 1980 Duke L.J. at 793.

4. What specific concerns does the court have in issuing protective orders?

The court must determine whether the protective order will facilitate the administration of justice or undermine one of the purposes of the litigation, *i.e.*, whether it prevents an abuse of process by a party or restrains a significant First Amendment interest. Besides the court's concern for minimizing injury to parties, the court has separate concerns for ensuring discovery is expeditious. If the absence of a protective order might mean a party's evasion of its duty to disclose and an end to voluntary compliance with discovery processes, a protective order may be the best means of insuring the orderly administration of discovery.

Once the interests for and against a protective order have been identified, the court must balance them, with the burden of justification resting on the party seeking the protec-

tive order. No simple rule will apply in all cases. If the government seeks to protect from dissemination highly relevant information regarding graft among public officials because of the annoyance and embarrassment of public disclosure, the balance will be struck differently than when a private party seeks to protect from public scrutiny personal details which are of questionable materiality to the case. Needless to say, courts should attempt to find the least restrictive accommodation of all interests, those of the parties and the court. *See In re Halkin,* 598 F.2d 176, 191 (D.C. Cir. 1979); *In re San Juan Star Co.,* 662 F.2d 108, 116 (1st Cir. 1981). Often the only alternative to a protective order will be denial of access—a result which the *Halkin* court indicated benefits no one.[14] A natural concomitant of finding the best accommodation of all interests is that the protective order be narrow and precise to protect against the specific harm threatened. *Halkin,* at 191; *San Juan Star,* at 116. This does not mean that a court must supervise the discovery of every document. *San Juan Star; Tavoulareas v. Piro,* 93 F.R.D. 11, 24 (D.D.C. 1981). To require as much would substantially undermine the purposes of discovery. Nevertheless, the court should restrain from publication only that which need be to prevent the harm that has been identified. Nor should the court restrain information for a period of time longer than is necessary. *See Halkin.* Implicitly, this would mean the termination of the protective order once information protected is a matter of public record.

The above discussion is meant as a guide to trial courts, not as a fixed rule. The major premise of the discussion is that where First Amendment interests can be identified, the harm against which a protective order guards must be balanced against those First Amendment interests, with the burden of justification lying with the party seeking the

---

[14]The *Halkin* court did identify alternatives to protective orders when the interest protected is an individual's right to a fair trial. *See Halkin,* 598 F.2d at 195.

restraint.

IV

Turning to this case, the trial judge issued both a protective order and a memorandum opinion regarding the protective order. The primary problem with the protective order is that it does not attempt to weigh petitioner's First Amendment interests in determining whether a protective order should issue. As the trial judge states at page 2 of his memorandum opinion:

> Protective Orders are entered routinely in cases where the party seeking the Protective Order has a reasonable basis for its request that the information gained through discovery be used by the discovering party for no purpose other than the legitimate purposes of the case in which discovery was granted.

Such a test, which is identical to the majority's standard, does not require any "heightened sensitivity" to First Amendment concerns.

In addition, the court's "reasonable basis" in this case is simply too speculative and general to justify the restraint of First Amendment freedoms. The trial judge states on page 4 of his memorandum opinion:

> If Protective Orders are not available, it could have a chilling effect on a party's willingness to bring his case to court. If the absence of a Protective Order has the effect of denying a party access to the courts, this would be a result just as damaging to justice and to individual rights as can result from an impingement upon First Amendment rights. I would put access to the courts on an equal plane of importance with freedom of the press because it is through the courts that our fundamental freedoms are protected and enforced.

And the protective order states:

> the absence of protective orders would have a chilling effect on a person's willingness to bring a case to court and that this would have the effect of denying persons access to the courts . . .

As a general proposition, the court's statement is certainly true in some cases. But is it true in this case? Would the

risk of dissemination cause Rhinehart to drop his libel action? Or are there other specific concerns for minimizing injury and embarrassment to respondents that outweigh the petitioner's First Amendment interest in dissemination? Such concerns might well exist in this case, but they are not identified by the court. As a threshold consideration, the trial court must identify the specific harm in this case that warrants a protective order. Courts have generally required a "particular and specific demonstration of fact" to justify protective orders. *General Dynamics Corp. v. Selb Mfg. Co.,* 481 F.2d 1204, 1212 (8th Cir. 1973), *cert. denied,* 414 U.S. 1162 (1974). *See United States v. IBM Corp.,* 67 F.R.D. 40, 46 (S.D.N.Y. 1975) (clearly defined and very serious injury); *Neonex Int'l Ltd. v. Norris Grain Co.,* 338 F. Supp. 845 (S.D.N.Y. 1972); *Glick v. McKesson & Robbins, Inc.,* 10 F.R.D. 477 (W.D. Mo. 1950); *United States ex rel. Edelstein v. Brussell Sewing Mach. Co.,* 3 F.R.D. 87 (S.D.N.Y. 1943). *Cf. Gulf Oil Co. v. Bernard,* 452 U.S. 89, 101, 68 L. Ed. 2d 693, 101 S. Ct. 2193, 2200 (1981) (Court struck down restraining order under Fed. R. Civ. P. 23 which affected First Amendment interests as an abuse of discretion because it was not based on a "clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties."). Here a specific finding by the court is required to insure that the restraint is justified.

On remand, I would call attention to two other concerns I have with the protective order. The order is narrow in that it restricts only the use of information gained through the discovery processes. Trial court memorandum opinion, at 3. The protective order is not narrow in two important respects, however. While paragraph 2 of the order seems to limit restrictions on dissemination to financial data and certain names and addresses, paragraph 3 states broadly (and somewhat inconsistently) "information gained by a defendant through the discovery process may not be published by any of the defendants or made available to any news media for publication or dissemination." While para-

graph 3 is apparently limited by the specific information discussed in paragraph 2, the court's opinion perpetuates the notion that *all* discovery information is restrained by the protective order:

> The intent and purpose of the protective order will be that the discovering party make no use or dissemination of the information gained through discovery other than such use as is necessary in order for the discovering party to prepare and try the case. It follows that information gained through the discovery process will not be published by the Seattle Times or made available to any news media for publication or dissemination.

Trial court memorandum opinion, at 3. Similarly, the restraint is not limited in time. Literally, the order restrains from publication information that is introduced as evidence at trial. On remand, I would require the court, if it should issue an order, to specify the conditions of the restraining order more carefully.

Through this opinion, I do not mean to imply that a protective order may not issue in this case. I would simply require the trial court to undertake the *ad hoc* balancing test outlined above. This the trial court has not done. A specific harm has not been identified by the trial court, First Amendment interests are given no recognition, and the order does not reflect the narrowness which derives from a concern for such interests. I would vacate the protective order and remand to the trial court to reconsider the request for a protective order in light of the concerns identified in this opinion.

PEARSON, J., concurs with UTTER, J.

Reconsideration denied January 27, 1983.